**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CREEKSIDE PARK OWNERS' ASSOCIATION, *et al.*, Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 23-0772<br>Filed: November 16, 2026 |

**OPINION AND ORDER**

Plaintiffs in this rails-to-trails action assert that the Federal Government's conversion of the Seattle and West Coast Railway Company's ("Railway") former rail line in the State of Washington to a public trail was a taking of their reversionary interest in the land underlying the rail line. According to Plaintiffs, they own land adjacent to the rail line, and because the Railway only ever acquired an easement over the land, they also own the land underlying the railroad to its centerline. Nineteen individual claims are at issue in the summary judgment motions now before the Court. Because the Court concludes that no genuine issues of material fact remain for trial and that Plaintiffs fail to demonstrate ownership of the land underlying the right of way, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** and the Government's Cross-Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

#### 1. The National Trails System Act

From 1920 to 1990 alone, the country's railway use plummeted from more than 270,000 miles of railway to approximately 140,000, and railroad companies have continued to abandon

tracks each year. *See Preseault v. Interstate Com. Comm'n* (*Preseault I*), 494 U.S. 1, 5 (1990); *Barclay v. United States*, 443 F.3d 1368, 1370–71 (Fed. Cir. 2006) (citation omitted). Wary that deserted tracks might be permanently lost, Congress enacted the National Trails System Act to preserve tracks at risk of abandonment by converting them to recreational trails. *Preseault I*, 494 U.S. at 5–6. The Surface Transportation Board ("STB") (previously the Interstate Commerce Commission) has exclusive authority over the construction, operation, and abandonment of railroad lines throughout the country under the Interstate Commerce Act of 1887 and the Transportation Act of 1920. *See, e.g.*, *Abbott v. United States*, 162 Fed. Cl. 445, 449 (2022).

Converting railroad tracks to a trail typically plays out as follows. To preserve a railway corridor or right of way for possible future use, a system commonly referred to as "railbanking," "the railroad company must first file an abandonment application under 49 U.S.C. § 10903, or a notice of exemption from that process under 49 U.S.C. § 10502." *Burnett v. United States*, 139 Fed. Cl. 797, 802 (2018). Any third party interested in railbanking can request a Certificate of Interim Trail Use ("CITU") after a railroad company files an application for abandonment, or a Notice of Interim Trail Use ("NITU") in abandonment exemptions. *Id.* Once the railroad company signals its willingness to negotiate a potential railbanking and interim use agreement, the STB will issue the CITU or NITU. *Id.* This procedure "preserves the STB's jurisdiction over the rail line and allows the railroad company to discontinue operations and remove track and equipment while the parties negotiate a railbanking and interim trail use agreement." *Id.* If the parties successfully negotiate an agreement, the NITU or CITU "automatically authorizes the interim trail use." *Id.* "If no agreement is reached, the railroad company may proceed with the abandonment process." *Id.* The railbanking system has allowed the STB "to preserve for possible future railroad use rights-of-way not currently in service." *Preseault I*, 494 U.S. at 6. In the process, however, the

system "has created a new category of Fifth Amendment takings cases before this Court, referred to as 'rails-to-trails' cases." *1100 W. Ewing Assoc., LLC v. United States*, 138 Fed. Cl. 357, 361 (2018). In rails-to-trails cases, landowners who own in fee simple the land over which the rail line runs seek just compensation under the Fifth Amendment for the taking of their property effected by the conversion of the rail line to a recreational trail. *See Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1552 (Fed. Cir. 1996).

2. The Woodinville Line

The pending dispute focuses on a 2.58-mile railroad segment located between mileposts 23.8 and 26.38 in Woodinville, Washington ("Woodinville Segment"). ECF No. 25-1 at 6, 81. The Railway began construction of the Woodinville Segment of the railroad in 1888. *Id.* at 32. During the 1890s and early 1900s, the Railway established the right of way for construction of the Woodinville Segment by obtaining conveyances from Ira and Susan Woodin and Patrick O'Meara and condemnation awards against G.A. Estabrook and Charles Estabrook, the then-fee simple owners of the properties over which the railroad would run. *See* ECF No. 25-4 at 123–24 ("Woodin deed"); ECF No. 25-4 at 150–51 ("O'Meara deed"); ECF No. 27-4 at 1–4 ("G.A. Estabrook condemnation"); ECF No. 27-4 at 5–8 ("Charles Estabrook condemnation").

This case concerns 19 Plaintiffs, all landowners in Woodinville, King County, Washington. Pls.' Mot. for Partial Summ. J. at 6, ECF No. 25. Plaintiffs purport to own the land parcels adjacent to the rail line at issue. *See, e.g.*, *id.* at 7. The property interests of two plaintiffs—Creekside Park Owners' Association ("Claim 1") and Cogan Real Property LLC ("Claim 2")—derive from the Woodin deed, which granted a right of way to the Railway. *See id.* at 13. The Woodin deed states:

> In consideration of the benefits and advantages to accrue to us, Ira Woodin and Susan Woodin his wife from the location, construction, and operation of the Seattle and West Coast Railway in the County of King in Washington Territory, we do hereby donate, grant and convey unto said Seattle and West Coast Railway

> Company a right of way one hundred (100) feet in width through our lands in said County, described as follows to-wit:
>
> The South half of the North East quarter and the East half of the North West quarter of Section Nine in Township Twenty six North of Range Five East.
>
> Containing One hundred and sixty acres Such a right of way strip to be fifty (50) feet in width on each side of the centre line of the railway track as located across our said lands by the Engineer of said Railway Company.
>
> It being understood that said Company shall put in a permanent under crossing under the trestle to be built over the portion of said lands on the north side of the slough running through said described premises and shall also put in a crossing at some point beyond said trestle where the track of said road comes to grade it being further understood that said Company shall pay said grantors at the rate of Seventy five dollars ($75.00) per acre for all cleared lands actually embraced within the limits of said right of way it being understood also that said Company shall construct a fence along one side of said right of way within one year from the construction of said railway.
>
> And the said Seattle and West Coast Railway Company shall have the right to go upon the lands adjacent to said line for a distance of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of said road.
>
> To have and to hold the said premises with the appurtenances unto the said party of the second part and to its successors and assigns forever.

ECF No. 25-4 at 123–24; *see* ECF No. 38-1 at 3 (transcription).

Seven plaintiffs' property interests derive from the O'Meara deed: KPM Woodinville, LLC ("Claim 3"), Whitescarver Properties, LLC ("Claim 4"), 6th & Union Center LLC ("Claim 5"), Donald W. Gonzales ("Claim 6"), DT, LLC ("Claim 7"), Lakepointe, Inc. ("Claim 8"), and J.N. Smith Properties, LLC ("Claim 9"). ECF No. 25 at 13–14. The O'Meara deed also granted the Railway a right of way. *See* ECF No. 25-4 at 150–51. Similar to the Woodin deed, the O'Meara deed states:

> In Consideration of the benefits and advantages to accrue to me Patrick O'Meara an unmarried man from the location, construction and operation of the Seattle and West Coast Railway, in the County of King in Washington Territory, I do hereby donate, grant and convey unto said Seattle and West Coast Railway Company a right of way one hundred (100) feet in width through my lands in said County,

> described as follows, to wit: The North West quarter of Section Ten in Township Twenty six North of Range five East[.]
>
> A further consideration for this conveyance being the agreement of said Railway Company made hereby to pay said grantor the sum of one hundred and fifty dollars for the land actually embraced within the limits of said right of way and an additional sum of twenty one and three fourths dollars ($21.75) per acre for all land in excess of seven acres that may be embraced in said right of way. Such right of way strip to be fifty (50) feet in width on each side of the center line of the railway track as located across my said lands by the Engineer of said Railway Company. The said Railway Company further agrees hereby that, in case said O'Meara should put up a saw mill or flour mill or other water mill on the stream known as Bear Creek at any point where it runs through said described premises said, Company shall build a side track from its main road at a point-thereon nearest by the most practicable route to said mill site; said Company also agrees to put in two crossings over said right-of-way for the use of said grantor. And the said Seattle and West Coast Railway Company shall have the right to go upon the land adjacent to said line for the distance of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of said road. To Have and to Hold The said premises, with the appurtenances, unto the said party of the second part, and to its successors and assigns forever.

*Id.*; *see* ECF No. 38-18 at 4 (transcription).

Another seven of the plaintiffs' property interests derive from the G.A. Estabrook condemnation, which was filed on November 21, 1887. *See* ECF No. 27-4 at 1–4. The G.A. Estabrook condemnation award states:

> Now on this 21st day of November 1887 this cause coming on for hearing upon motion of Preston & Albertson, attorneys for said Plaintiff, for Judgment by default herein against said defendant and for the confirmation of the Appraisers' Report heretofore filed in said cause and for the condemnation and appropriation by the Court to the use of said Seattle and West Coast Railway Company for its corporate purposes as a Right of Way of that certain strip or parcel of land mentioned and described in said Appraisers' Report and hereinafter particularly described . . . .
>
> . . .
>
> [A]nd after their said appointment said Appraisers duly examined the ground hereinafter described and did then and there assess the damages sustained by said defendant to be sustained by them in consequence of the appropriation by said Plaintiff of said above mentioned strip of land, over and above the additional value which the owner of adjoining lands would derive from the construction of the Railway of said Plaintiff . . . .

> . . .
>
> Wherefore, by reason of the law and the premises, it is ordered, considered and adjudged by the court:
>
> 1st, That [default is entered against defendant].
>
> 2nd, That the said Plaintiff . . . be, and said Company hereby is, authorized and allowed to appropriate to its own use, for right of way said above mentioned strip of land now here particularly described as follows, to wit:
>
> A strip of land one hundred feet in width running through the [respective quarter sections] of Section Three in Township Twenty Six, North of Range Five East, said Strip being fifty feet on each side of the center line of the railway of said Plaintiff: Said right of way strip being the strip of land heretofore marked out and now located as such right of way by the engineers of said Railway Company, a particular description of the abovementioned center line being as follows: [centerline description].
>
> 3rd, That said described Right of Way strip be, and the same is hereby condemned and appropriated by the Court to the perpetual use and occupation of said Seattle and West Coast Railway Company for its corporate purposes.

*Id.* Plaintiffs owning property traceable to this condemnation include: Maverick Retail, LLC ("Claim 10"), GT Clearwater LLC ("Claim 11"), Greenbaum Associates ("Claim 12"), Pacific Systems Building Associates, LLC and deJonge Delta/BC LLC ("Claim 13"), Money Saver Woodinville Associates, LLC ("Claim 14"), Woodinville Hotel Investors, LLC ("Claim 15"), and SLH Woodinville Development LLC ("Claim 16"). *See* ECF No. 25 at 14.

The Charles Estabrook condemnation was also filed on November 21, 1887. *See* ECF No. 27-4 at 5–8. Its language is materially identical to the G.A. Estabrook condemnation filed on the same date. *See id.* at 1–3. One plaintiff, Underwood Gartland 140, LLC ("Claim 17"), traces its property interest to the Charles Estabrook condemnation. *See* ECF No. 25 at 14.

The two remaining plaintiffs, Tjossem Properties (comprised of Tjossem Properties IV and Tjossem Properties V, who jointly own one property) ("Tjossem") ("Claim 18") and Lazy Deuce, LLC ("Lazy Deuce") ("Claim 19") were not included in Plaintiffs' Motion for Partial Summary

Judgement, *id.* at 6 n.1, but were included in the Government's Cross-Motion for Summary Judgment, ECF No. 26 at 32. At oral argument, Plaintiffs' counsel conceded that Lazy Deuce does not own the property at issue in this case in fee; that Tjossem was already fully compensated in *Haggart v. United States*, 108 Fed. Cl. 70 (2012); and that, accordingly, summary judgment should be entered against these plaintiffs. *See* Oral Arg. Tr. at 109:7–111:8, ECF No. 37.

The ultimate successor to the Railway's interest in the rail line is GNP RLY, Inc. ("GNP"). *See* ECF No. 25-1 at 1. On March 18, 2022, GNP filed a verified Notice of Exemption for the Woodinville Segment. *Id.* In the Notice, GNP articulated its plan to transfer its property interest to the City of Woodinville for the purpose of converting the line into a trail in accordance with 49 C.F.R. § 1152.29. *Id.* at 3. On May 5, 2023, the City of Woodinville submitted a letter to the STB in its role as trail sponsor requesting the issuance of a NITU for the Woodinville Segment. ECF No. 25-2 at 1–2. GNP similarly filed a letter stating its support for the NITU. *Id.* at 6.

### B. This Litigation

On May 26, 2023, the STB released its decision and NITU or Abandonment for the Woodinville Segment. ECF No. 25-3 at 1. Plaintiffs filed their Complaint that same day. ECF No. 1. A year and a half later, on October 10, 2024, Plaintiffs moved for partial summary judgment on 17 of the 19 claims, asserting that there is no genuine dispute of material fact and that, as a matter of Washington state law, Plaintiffs own in fee the land underlying the rail line. *See* ECF No. 25 at 7–9. Plaintiffs claim that the source documents—*i.e.*, the Woodin and O'Meara deeds, as well as the Charles and G.A. Estabrook condemnations—demonstrate that the Railway only acquired easement interests in the Woodinville Segment from the original grantors. *Id.* at 26–30. Plaintiffs also contend that under Washington's centerline presumption, the Court should presume Plaintiffs, as owners of the land adjacent to the railroad, own the land underneath the rail line up

to its centerline. *See id.* at 32–38. The Government filed its Response and Cross-Motion for Summary Judgment as to all 19 claims on November 22, 2024. ECF No. 26 at 6–7. The Government argues that Plaintiffs fail to prove they own the land underlying the right of way, as the source documents conveyed a fee interest to the Railway. *Id.* Alternatively, the Government asserts that the centerline presumption either does not apply or has been rebutted by, among other things, the City of Woodinville's competing claim of ownership. *Id.*

On December 20, 2024, Plaintiffs filed their Response and Reply. ECF No. 27. Plaintiffs dispute the Government's claim that the centerline presumption is inapplicable and, in any event, rebutted, *id.* at 6–7, citing chains-of-title documentation prepared by a third party, which they attached to their brief, *see* ECF Nos. 27-1, 27-2, 27-3, 27-4. The Government filed its Reply on January 22, 2025, reiterating its previous arguments, urging the Court to exclude Plaintiffs' chain-of-title evidence, and arguing that, in any case, Plaintiffs' chain-of-title evidence is unavailing. ECF No. 30 at 5, 12–14. The Court held oral argument on June 26, 2025. *See* Min. Entry, June 26, 2025. The motions are now ripe for disposition.

## II. LEGAL STANDARDS

### A. Summary Judgment

This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"). A "material" fact is a fact that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists when a factfinder could reasonably resolve the dispute "in favor of either party." *Id.* at 250. Where parties cross-move for summary judgment, "each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose

motion is being considered." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009).

Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

**B. "Rails-to-Trails" Takings**

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. A rails-to-trails taking occurs when "government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010) (citing *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009)). The "threshold question" in these circumstances "is whether the claimant has a compensable property interest in the land allegedly taken, which is often answered by analyzing the original deeds that conveyed the property to the railroad." *Chi. Coating Co. v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (citing *Preseault I*, 494 U.S. at 16); *see also Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation.").

As explained by the Federal Circuit, the Government's liability in rails-to-trails cases turns on three questions:

> (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Ellamae Phillips*, 564 F.3d at 1373 (citing *Preseault II*, 100 F.3d at 1533). To determine whether the railroad held the property in fee simple or merely possessed an easement, and to determine the scope of any such easement, the Court looks to state law, which "creates and defines the scope of the reversionary or other real property interests." *Preseault I*, 494 U.S. at 20 (O'Connor, J., concurring); *see also Preseault II*, 100 F.3d at 1534–37 (relying on state law to determine what interests were conveyed by the transfers at issue).

Washington law applies in this case because the relevant property is in the State of Washington. Decisions of the Washington Supreme Court are therefore controlling. *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1359 (Fed. Cir. 2005). In the absence of state supreme court precedent, the Court must endeavor to predict how the court would rule. *Id.* (quoting *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002)). When doing so, the Court gives "proper regard" to "relevant rulings of other courts of that state." *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 165 (Fed. Cir. 1985). Indeed, the Court must abide by the opinion of an intermediate state court "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

## III. DISCUSSION

The present dispute involves three issues: (1) whether Washington law dictates that the source documents conveyed the property underlying the rail line to the Railway in fee, or whether

they merely granted the Railway easements across the land; (2) if the source documents granted the Railway easements only, whether Plaintiffs can demonstrate ownership of the land underlying the rail line by relying on Washington's centerline presumption; and (3) if the centerline presumption applies, whether evidence has rebutted the presumption. For the reasons explained below, the nine claims traceable to the deeds fail at step one of the *Preseault II* analysis because the deeds granted the property underlying the rail line to the Railway in fee simple. As for the eight claims traceable to the condemnations, however, the Court finds that the Railway acquired easements only. Nevertheless, these claims fail because Plaintiffs cannot rely on Washington's centerline presumption and thus cannot show that they were deprived of a compensable property interest.

## A. The Woodin and O'Meara Deeds Conveyed Fee Title to the Railway.

The parties dispute whether the Woodin and O'Meara deeds granted the Railway fee simple title or an easement over the land. According to Plaintiffs, the language of the deeds reflects an intent to convey easements only, as the deeds each grant the Railway a "right of way" in consideration of the benefits to accrue from the operation of the rail line. *See* ECF No. 25 at 28. The Government, however, argues that the "right of way" language is not dispositive because under Washington law, a railroad can acquire a right of way as an easement or in fee simple, and thus further purpose-limiting language is required to demonstrate that the Railway acquired solely an easement. ECF No. 26 at 23–32. The Government also argues that the stated consideration merely announced the Railway's reason for acquiring the land but did not otherwise limit the scope of the conveyance. *Id.* at 23–24. The Court agrees with the Government: Plaintiffs fail to demonstrate that they—or their predecessors-in-interest—retained any property interests in the

land underlying the rail line, and thus the Government's summary judgment motion must be granted for Claims 1–9.

1. <u>Washington Law Governing the Interpretation of Railroad Deeds Has Evolved over Time.</u>

According to the Washington Supreme Court, the term "right of way" has a "twofold meaning"; it can either "describe a mere right of passage over a tract," and thus indicate the conveyance of an easement, or "describe the strip of land which railroad companies purchase" in fee. *Morsbach v. Thurston Cnty.*, 278 P. 686, 688 (Wash. 1929). Because of this twofold meaning, the Washington Supreme Court has emphasized that the term "right of way" generally conveys an easement only where that term is used "as a limitation or to specify the purpose of the grant." *Brown v. State*, 924 P.2d 908, 913 (Wash. 1996). "Conversely, where there is no language in the deed relating to the purpose of the grant or limiting the estate conveyed, and it conveys a definite strip of land, the deed will be construed to convey fee simple title." *Id.* Ultimately, however, "the intention of the parties to the conveyance is of paramount importance and must . . . prevail in a given case." *Swan v. O'Leary*, 225 P.2d 199, 200 (Wash. 1950). Thus, courts should take a wholistic approach to "ascertain the parties['] intent by performing a deed-by-deed inquiry into the interests conveyed based on (1) the particular language of the deed, (2) the form of the deed, and (3) the surrounding circumstances and subsequent conduct of the parties." *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*, 126 P.3d 16, 22 (Wash. 2006).

Early Washington Supreme Court decisions finding that railroads acquired mere easements consistently grounded their analysis in purpose-limiting language. *See, e.g.*, *Biles v. Tacoma, O. & G.H.R. Co.*, 32 P. 211, 212–13 (Wash. 1893) (finding an easement where the deed said the "strip of land" was "to be used *for a right-of-way* or *other railroad purposes*" (emphases added)); *Reichenbach v. Wash. Short Line Ry. Co.*, 38 P. 1126, 1126–27 (Wash. 1894) (deed granted "a

right of way *for said railroad*" and included in the habendum clause, "*so long as the same shall be used for the operation of a railroad*" (emphases added)), *overruled on other grounds by Brown v. Baldwin*, 89 P. 483 (Wash. 1907), *as recognized in Carlson v. Curren*, 93 P. 315 (Wash. 1908); *Pac. Iron Works v. Bryant Lumber & Shingle Mill Co.*, 111 P. 578, 579 (Wash. 1910) (habendum clause stated that the railroad received the property "forever, for railway purposes"); *Morsbach*, 278 P. at 687–90 (deed granted a "right of way *for the construction of said company's railroad*" (emphasis added)); *Swan*, 225 P.2d at 199–201 (deed conveyed "a strip of land" "*for the purpose of a Railroad right-of-way*"); *Roeder Co. v. Burlington N., Inc.*, 716 P.2d 855, 857–59 (Wash. 1986) (deed conveyed tracts and parcels of land "*for all railroad and other right of way purposes*" (emphasis added)). Such cases thus establish that where the granting (or habendum) clause of a conveyance declares the purpose of the deed to be a railroad right of way, the deed generally grants an easement only. *Swan*, 225 P.2d at 201.

In *Brown v. State*, 924 P.2d 908 (Wash. 1996), however, the Washington Supreme Court reframed the analysis, emphasizing that courts must look beyond the purpose of the conveyance and also examine the following set of factors to elucidate the intent of the parties and determine the interest granted:

> (1) whether the deed conveyed a strip of land, and did not contain additional language relating to the use or purpose to which the land was to be put, or in other ways limiting the estate conveyed; (2) whether the deed conveyed a strip of land and limited its use to a specific purpose; (3) whether the deed conveyed a right of way over a tract of land, rather than a strip thereof; (4) whether the deed granted only the privilege of constructing, operating, or maintaining a railroad over the land; (5) whether the deed contained a clause providing that if the railroad ceased to operate, the land conveyed would revert to the grantor; (6) whether the consideration expressed was substantial or nominal; and (7) whether the conveyance did or did not contain a habendum clause, and many other considerations suggested by the language of the particular deed.

*Id.* at 912 (citing *Swan*, 225 P.2d at 200–01). The Washington Supreme Court additionally instructed courts to "look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties" as further evidence of the parties' intent. *Id.* Importantly, *Brown* involved a statutory warranty form deed, which presumptively conveys fee simple title. *See id.* at 912 (noting that property owners must "show[] that the original parties intended to adapt the statutory form to grant easements instead of fees simple"). After performing this multifactor analysis, *Brown* held that "construing the deeds [at issue] to convey fees simple more accurately reflects the intent of the parties, given the form of the deeds and the fact they convey 'fee simple title' to definite strips of land given without any limitation or qualification." *Id.* at 915.[1]

The Washington Supreme Court clarified its *Brown* opinion in *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Association*, 126 P.3d 16 (Wash. 2006), its most recent pronouncement on the issue of railway deeds. The *Kershaw* court stated that *Brown* did not overrule the general presumption that a granting clause's use of the term right of way "as a limitation or to define the purpose of the grant" conveys an easement. 126 P.3d at 22. Instead, it explained that "the *Brown* court partially qualified this rule" by focusing on a factor-based analysis that "ascertain[s] the parties['] intent" through "a deed-by-deed inquiry into the interests

[1] Although *Brown* relied on seven factors to determine whether the parties intended to adapt the statutory form to grant an easement, the *Brown* court pulled the factors from *Swan*, *see Brown*, 924 P.2d at 912 (citing *Swan*, 225 P.2d at 200), which more broadly invoked them as a means to "arrive at the intention of the parties," *Swan*, 225 P.2d at 200. Thus, even though the Woodin and O'Meara deeds do not follow the statutory form, the Court will use the *Brown* factors to ascertain the intent of the parties in the case at hand. *See Kershaw*, 126 P.3d at 22 (describing the *Brown* factors as "factors courts should consider in reading railroad deed language"); *King Cnty. v. Rasmussen*, 299 F.3d 1077, 1084–85 (9th Cir. 2002) (relying on the factors to determine whether a deed conveyed fee simple or an easement); *Ray v. King Cnty.*, 86 P.3d 183, 187 (Wash. Ct. App. 2004) (applying the *Brown* factors to determine the parties' intent); ECF No. 25 at 17 n.9 ("These considerations and factors as discussed in *Swan* later became part of the Court's analysis in *Brown*.").

conveyed." *Id.* In so doing, "*Brown* refined the principle relied on in [the court's prior cases]" to emphasize "a more thorough examination of the deed." *Id.* at 23. In *Kershaw*, the deed at issue conveyed a strip of land "*to be used* by [the railroad] *as a right of way for a railway*," language that resembled earlier Washington Supreme Court cases where the term right of way was "used to establish the purpose of the grant and thus presumptively convey[] an easement interest." *Id.* at 22–23 (emphases in original). But like *Brown*, the deed at issue in *Kershaw* was in the statutory warranty form, and thus presumptively conveyed fee simple title as well. *Id.* at 23. Considering these competing presumptions, the court examined the *Brown* factors to further ascertain the parties' intent and ultimately concluded that "there [was] insufficient evidence to overcome the presumption that an easement was created." *Id.* at 25.

Plaintiffs provide a similar and thorough summary of Washington Supreme Court caselaw, *see* ECF No. 25 at 14–25, but they fail to wrestle with the unique language in the Woodin and O'Meara deeds. Instead, they attempt to analogize this case to favorable Washington Supreme Court precedent in which the deeds at issue expressly limited the purpose or scope of the conveyances. This analogy fails. As explained below, the Woodin and O'Meara deeds reflect no such purpose-limiting language. Thus, no presumption of an easement applies, and the Court must turn to the *Brown* factors—all of which are either neutral or suggest that the original grantors intended to convey fee simple title to the Railway.

2. <u>The Woodin and O'Meara Deeds Do Not Use the Term Right of Way as a Limitation or to Define the Purpose of the Conveyance.</u>

None of the above-quoted Washington Supreme Court cases involved language quite like the deeds at issue here. The Woodin deed states: "In consideration of the benefits and advantages to accrue to us . . . from the location, construction, and operation of the [railway] . . . [the grantors] do hereby donate, grant, and convey" unto the Railway "a right-of-way one hundred (100) feet in

width[.]" *Id.* at 26. The deed continues: "Such right-of-way strip to be fifty (50) feet in width on each side of the centre line of the railway track[.]" *Id.* The deed also contains the following habendum clause: "To have and to hold the said premises with the appurtenances unto the said party of the second part and to its successors and assigns forever." *Id.* The O'Meara deed is largely identical: "In consideration of the benefits and advantages to accrue to [the grantor] . . . from the location, construction, and operation of the [railway] . . . [the grantor] . . . hereby donate[s], grant[s] and convey[s]" unto the Railway "a right of way one hundred (100) feet in width . . . . Such right of way strip to be fifty (50) feet in width on each side of the center line of the railway track[.]" *Id.* at 27. The O'Meara deed also contains a habendum clause that mirrors that of the Woodin deed. *See id.* at 28. Plaintiffs argue that the deeds conveyed easements only, as each "deed is titled 'Right-of-Way Deed' and specifically grants a 'right-of-way' in the granting clause." *Id.*

Upon review, the Court finds that the deeds do not presumptively convey easements under Washington law, as neither "uses the term 'right of way' as a limitation or to define the purpose of the grant." *Kershaw*, 126 P.3d at 22. Instead, the deeds use the term "right of way" as a means to "describe the strip of land which [the Railway] purchase[d]." *Morsbach*, 278 P. at 688; *see also Brown*, 924 P.2d at 913 ("[A] railroad can own rights of way in fee simple or as easements."). Unlike the deeds at issue in the many Washington Supreme Court cases reviewed above, the Woodin and O'Meara deeds do not state that the right of way strips were conveyed "for the purpose of a Railroad right-of-way," *Swan*, 225 P.2d at 199 (emphasis omitted), nor that the right-of-way strips were "to be used for . . . railroad purposes," *Biles*, 32 P. at 212; *see also Roeder*, 716 P.2d at 857, or "for said railroad," *Reichenbach*, 38 P. at 1126; *see also Morsbach*, 278 P. at 687; *Kershaw*, 126 P.3d at 22. The fact that the deeds are titled "Right-of-Way Deed" also provides minimal

support for Plaintiffs' argument, as the Washington Supreme Court has explicitly noted that a deed's title is not dispositive; a "Right-of-Way Deed" may nonetheless convey fee simple title. *See, e.g.*, *Brown*, 924 P.2d at 915.

Although Plaintiffs argue that the deeds limit the conveyances to railroad purposes by citing as consideration "the benefits and advantages to accrue to us from the location, construction and operation of the railroad," ECF No. 25 at 28 (quotation marks omitted), the Court disagrees with that reading. As correctly argued by the Government, Plaintiffs "conflate the purpose of the conveyance with a grant for a specific purpose"—that is, they misconstrue the Railway's *reason* for purchasing the right of way as a *limitation* on how the Railway was permitted to use it. ECF No. 26 at 30. The consideration cited by Plaintiffs establishes that the Railway intended to use its interest to construct and operate a railroad—but the Railway could effectuate that purpose regardless of whether it received an easement or fee simple title. Indeed, *Brown* explicitly stated that "[i]dentifying the purpose of the conveyance . . . does not resolve the issue at hand because a railroad can own rights of way in fee simple or as easements." 924 P.2d at 913. Thus, although there was "no question" that the railroad "acquired the property for railroad purposes" under the deeds at issue in *Brown*, the court nonetheless found that the deeds conveyed fee simple title. *Id.* Accordingly, the Court does not find that the stated consideration provides support for Plaintiffs' argument that the Woodin and O'Meara deeds limited the purpose of the conveyances. *See King Cnty. v. Rasmussen*, 299 F.3d 1077, 1086 (9th Cir. 2002) (interpreting a deed with identical "precatory language" and finding it significant that the language "did not actually condition the conveyance on such use").

The only Washington Supreme Court case holding that a deed conveyed an easement despite a lack of clear purpose-limiting language is *Veach v. Culp*, 599 P.2d 526 (Wash. 1979). In

that case, the court held that a deed conveyed an easement where the grantors "remise[d], release[d], and forever quit claim[ed] . . . all that certain lot, piece, or parcel of land . . . to wit: A right-of-way one hundred feet wide." *Id.* at 527. The court based its holding on *Swan*, which stated that a "deed passes an easement only" where "the granting clause . . . declares the purpose of the grant to be a right of way for a railroad." *Id.* at 528 (quoting *Swan*, 225 P.2d at 201). In finding that the deed granted the railroad an easement only, the *Veach* court indicated that inclusion of the term "right of way" in the granting clause was sufficient to limit the purpose of the conveyance such that the railroad acquired an easement only. *See id.* As argued by the Government, however, "*Veach* does not stand for the proposition that the use of the term 'right of way' in the granting clause always and necessarily means that only an easement is conveyed." ECF No. 26 at 31 n.9. Rather, the Washington Supreme Court has—both before and after *Veach*—emphasized that a right of way may be conveyed either in fee or as an easement. *See, e.g.*, *Roeder*, 716 P.2d at 859.

The Washington Court of Appeals recognized this in *Ray v. King County*, 86 P.3d 183, 186 (Wash. Ct. App. 2004), finding that a railroad acquired fee simple title even though the granting clause of the deed conveyed "a right of way one hundred (100) feet in width." The court determined that the language of the deed "suggest[ed] a fee, not a mere easement," because it conveyed a "right of way one hundred (100) feet in width ***through*** [the grantors'] ***lands***" and later described the property conveyed as a "right of way ***strip***." *Id.* at 189 (emphases in original) (cleaned up).[2] The court rejected the plaintiffs' argument that "use of the term 'right of way' invariably means that only an easement is conveyed," emphasizing that the term must be used "as a limitation or to specify the purpose of the grant." *Id.* Upon review of the *Brown* factors, the

[2] This operative language is essentially identical to that of the Woodin and O'Meara deeds.

court concluded that the deed conveyed an easement, specifically emphasizing that the deed conveyed the right of way "without expressly *restricting* how that right of way was to be used." *Id.* at 190 (emphasis in original).[3]

At first, these holdings appear incongruous: *Veach* held that a deed conveying "[a] right-of-way one hundred feed wide" granted an easement, while *Ray* concluded that a deed conveying "a right of way one hundred (100) feet in width through our lands" granted fee simple title.[4] Nevertheless, in *Kershaw*, the Washington Supreme Court positively cited both *Veach* and *Ray*. *See, e.g.*, 126 P.3d at 21 (*Veach*); *id.* at 25 n.11 (*Ray*). The court first discussed *Veach* when reviewing its past precedent, stating that *Veach* adhered to the principle that a deed conveys an easement where the granting clause declares the purpose of the deed or otherwise limits the interest conveyed. *Id.* at 21. As summarized by the *Kershaw* court, *Veach* "held that the use of the term 'right-of-way' in the granting clause trumped the other considerations and reflected intent to create an easement only." *Id.* Yet later, *Kershaw* distinguished *Ray* on the basis that there was "no presumption in favor of an easement" because the deed in *Ray* only included the term right of way

---

[3] As both *Veach* and *Ray* preceded the Washington Supreme Court's opinion in *Kershaw*, neither mirrors its analytical framework—*i.e.*, determining whether any presumption applies before reviewing the *Brown* factors to further illuminate the intent of the parties. *Kershaw*, 126 P.3d at 23; *see also Beres v. United States*, 97 Fed. Cl. 757, 782–87 (2011) (stating that "the court must first determine if any presumptions exist" before turning to the *Brown* factors). In *Veach*, the court focused on the deed's use of the term "right of way" in the granting clause to find that it conveyed an easement. 599 P.2d at 528. In turn, *Ray* mostly analyzed the *Brown* factors, though it rejected the plaintiffs' argument that use of the term "right of way" invariably grants an easement and determined that the deed was not in the statutory form. *See generally* 86 P.3d 183.

[4] In *Ray*, the Washington Court of Appeals distinguished *Veach* on the basis that the court "did not consider the full range of factors that the supreme court in *Brown* later articulated for characterizing the nature of the interest conveyed." 86 P.3d at 189. Though the Court agrees with this assertion, the distinction is not particularly relevant at this point in the analysis, where the Court is answering the threshold question of whether the language in the deeds supports a presumption of an easement.

"to the extent that it stated it was conveying a 'right of way strip.'" *Id.* at 25 n.11. Unlike the *Ray* deed, the deed in *Kershaw* "specifically established the *purpose* of the grant when it stated the land was 'to be used by [the Railway] as a right of way for a railway'" and thus "create[d] a presumption in favor of an easement which was not present in *Ray*." *Id.* (emphasis in original) (first alteration in original).

Despite the apparent similarity of the deeds at issue, *Veach* and *Ray* can be distinguished, as indicated by the Washington Supreme Court's decision in *Kershaw*. Though the deeds in *Veach* and *Ray* both granted a right of way 100 feet wide, the *Ray* deed later refers to this right of way as a "right of way strip," whereas the *Veach* deed does not refer to the right of way as a "strip." This is significant because the first three *Brown* factors all emphasize the need to consider whether the deed conveys a strip of land. *See* 924 P.2d at 912. And indeed, in *Kershaw*, the court emphasized the fact that the *Ray* deed included the term right of way "only to the extent that it stated it was conveying a 'right of way *strip*.'" 126 P.3d at 25 n.11 (emphasis added). Here, like the *Ray* deed, the Woodin and O'Meara deeds each describe the 100 foot right of way conveyed as a "right of way *strip*." ECF No. 25 at 26–27 (emphasis added). As such, both deeds more clearly resemble the deed at issue in *Ray*, particularly with regard to the distinction emphasized by the Washington Supreme Court in *Kershaw*. In fact, the parties do not dispute that the Woodin and O'Meara deeds are nearly identical to the deed at issue in *Ray*. *See id.* at 29 & n.15; ECF No. 27 at 14; *see also* ECF No. 26 at 26–27. Thus, the Washington Supreme Court has indicated that right-of-way language like the language of the Woodin and O'Meara deeds does not create a presumption in favor of an easement because it does not use the term right of way "as a limitation or to define the purpose of the grant." *Kershaw*, 126 P.3d at 22.

The Washington Supreme Court's response to a prior rails-to-trails case further bolsters this conclusion. In *Schroeder v. United States*, 66 Fed. Cl. 508, 510 (2005), another judge of this court reviewing, among others, the same railroad deed at issue in *Ray* (which, as mentioned, is largely identical to the deeds at issue here) sought to certify the following question to the Washington Supreme Court: "When the granting clause of a deed expressly conveys a 'right-of-way' to a railroad, does Washington state law hold that the property interest conveyed to the railroad is an easement as distinguishable from a fee simple?" Put simply, the court asked the Washington Supreme Court the very question that is now before the Court in this case. The Washington Supreme Court denied the certification request, stating that "in light of existing precedent such as [*Brown*] and [*Ray*], the questions posed . . . are not 'question[s] of state law . . . which [have] not been clearly determined." *Beres v. United States*, 97 Fed. Cl. 757, 765 (2011) (quoting Order at 1–2 (Wash. Oct. 7, 2005)). This statement by the Washington Supreme Court provides further support that *Ray*—and not *Veach*—governs the interpretation of the Woodin and O'Meara deeds. *See West*, 311 U.S. at 237 (explaining that courts must follow the holdings of intermediate appellate courts "unless [the court] is convinced by other persuasive data that the highest court of the state would decide otherwise").

In sum, the lack of additional language limiting or specifying the purpose of the grant, the holding in *Ray* with respect to almost identically worded deeds, the *Kershaw* court's analysis of *Ray*, the Woodin and O'Meara deeds' use of the term "right of way *strip*," and the Washington Supreme Court's certification denial all indicate the best reading of the Woodin and O'Meara deeds is that they do not use the term "right of way" as a limitation or to define the purpose of the

grant. Accordingly, under Washington law, no presumption of an easement applies, and the Court turns to the *Brown* factors to further ascertain the parties' intent.[5]

3. The *Brown* Factors Support a Finding of Fee Title.

A majority of the *Brown* factors support a finding that the Woodin and O'Meara deeds granted the right of way to the Railway in fee simple. The Court takes each factor in turn.

The first two factors focus on whether the deed conveyed a strip of land and whether any additional language limited the Railway's use of the land conveyed. *See Brown*, 924 P.2d at 912. The third factor likewise asks "whether the deed conveyed a right of way over a tract of land, *rather than* a strip thereof." *Id.* (emphasis added). The Court will analyze these three factors together.

The Woodin and O'Meara deeds each conveyed a "right of way . . . through [their] lands," which the deeds subsequently described as a "right of way strip."[6] ECF No. 25-4 at 123–24, 150–51. The deeds thus described the conveyance both as a "right of way" and as a "strip." But because "a railroad can own rights of way in fee simple," the deeds' description of the property conveyed as a "right of way," according to *Brown*, "simply begs the question of what interest [the Railway]

[5] Neither party argues that the deeds are in a statutory form, and thus the Court does not apply a presumption that they conveyed fee simple title. *See Kershaw*, 126 P.3d at 24 (concluding that "*Brown* establishes that use of a statutory warranty deed creates a presumption that fee simple title is conveyed").

[6] *Ray* considered use of the term "right of way strip" in the legal description of the deed as relevant to the first three *Brown* factors, even if the word "strip" does not also appear in the deed's granting clause. 86 P.3d at 189–90. The Washington Supreme Court's opinion in *Veach* indicates that such an approach is correct, as "the description is in fact a part of the granting clause," and thus the language used in the legal description is significant in determining the interest conveyed. 599 P.2d at 527. Though the court in *Brown* dismissed the significance of the deeds' use of the term "right of way" because it was in the legal description, the court did so because "[t]he words 'right of way' can have two purposes: (1) to qualify or limit the interest granted" or "(2) to describe the strip of land being conveyed." 924 P.2d at 914. The court did not indicate that use of the word "strip" should be considered similarly insignificant if found in the legal description.

acquired." 924 P.2d at 914; *see also 1100 W. Ewing*, 138 Fed. Cl. at 367 (rejecting the plaintiff's argument that use of the term "right of way" in the granting clause is conclusive evidence of an easement under Washington law). As a result, the "strip" language is important, as it indicates that the grantors conveyed fee simple title. *Ray*, 86 P.3d at 189 (citing *Brown*, 924 P.2d at 912).

Also important is the lack of additional language in the Woodin and O'Meara deeds specifying the purpose of the conveyance or limiting the Railway's use of the right of way. *See Kershaw*, 126 P.3d at 23 (holding that, although the deed conveyed a strip of land, it "specifically set forth that it was to be used as a right of way" and thus granted an easement (cleaned up)); *see also, e.g.*, *Swan*, 225 P.2d at 199 (granting a right of way "for the purpose of" a railroad); *Morsbach*, 278 P. at 687 (limiting the grant to a right of way "for the construction of" a railroad); *Biles*, 32 P. at 212 (conveying the land solely "for a right of way, or other railroad purposes"); *Roeder*, 716 P.2d at 857 (granting the land "for all railroad and other right of way purposes"). These first three factors therefore favor a finding that the Woodin and O'Meara deeds granted the Railway fee simple title. *See Brown*, 924 P.2d at 913 ("[W]here there is no language in the deed relating to the purpose of the grant or limiting the estate conveyed, and it conveys a definite strip of land, the deed will be construed to convey fee simple title."); *Ray*, 86 P.3d at 189–90 (reviewing a nearly identical deed and finding that the first three *Brown* factors favor an easement because the "deed conveyed a strip of land" and "grant[ed] a right of way . . . without expressly *restricting* how that right of way was to be used" (emphasis in original)).

In their response and reply, Plaintiffs cite the tree-cutting provision included in each of the deeds, which granted the Railway "the right to go upon the lands adjacent to said line for a distance of two hundred (200) fee [sic] on each side thereof and cut down all trees dangerous to the operation of said road." ECF No. 27 at 14 (emphasis omitted). According to Plaintiffs, this

additional grant indicates that the Railway only acquired an easement because, if the Railway owned the right of way in fee, it would have no need for this additional grant. *See id.* at 14–15 (citing *Kershaw*, 126 P.3d at 24–25). The Court is not convinced by this argument. As the Government points out, "[t]he Woodin and O'Meara deeds grant a right of way 50 feet on either side of the railroad tracks," and thus, "[t]he tree-cutting provision necessarily allows the railroad to enter onto land not conveyed by the deed." ECF No. 30 at 24 n.12. In fact, the tree-cutting provision better supports the Court's finding of a fee, as it clearly restricted what the Railway was permitted to do with the additional 150 feet on either side of the railroad, in contrast to the main grant of the right of way, which contained no such purpose-limiting language. *See* ECF No. 25 at 26–28. That the deeds measured the additional grant from the centerline of the right of way, rather than from the edge of the right of way, is insignificant. It is true that if the Railway owned 50 feet on either side of the rail line in fee, this additional grant to cut down trees within that area would be overinclusive—insofar as it conveyed some rights that the Railway already possessed. Even so, the parties' use of the right of way's centerline as a point of reference, rather than its edge, more likely reflects their practical solution to a measurement problem than their overall intent when conveying the right of way.

The fourth *Brown* factor similarly asks "whether the deed granted only the privilege of constructing, operating, or maintaining a railroad over the land." 924 P.2d at 912. Here, the deeds included no such limiting language. Rather, the granting clauses each conveyed a "right of way one hundred (100) feet in width through [the grantors'] lands." *E.g.*, ECF No. 25-4 at 123–24. While both deeds expressed that the properties were given in consideration of the benefits "to accrue to [the grantors] from the location, construction, and operation of" the railroad, *id.* at 123, they did not condition the grant on the railroad's continued operation nor clearly limit it to railroad

purposes. To be sure, the consideration suggests that the Railway acquired the strip of land for use as a rail line, and the Court has no reason to doubt that such is true. Nonetheless, the fourth *Brown* factor does not ask whether the railroad acquired the interest to build railroad tracks; it asks whether the grant was limited to *only* railroad purposes. Because no language indicates as much in either the Woodin or O'Meara deeds, the fourth factor supports a finding that the deeds conveyed fee simple title.

The fifth factor looks for a "clause providing that if the railroad ceased to operate, the land conveyed would revert to the grantor," which suggests that the deed conveyed an easement. *Brown*, 924 P.2d at 913. Here, neither deed contains such a reverter clause. As a result, "this factor is inapplicable in this instance and does not favor one interpretation over the other." *Kershaw*, 126 P.3d at 24 (noting the deed's lack of a reverter clause).

The sixth factor asks "whether the consideration expressed was substantial or nominal." *Brown*, 924 P.2d at 913. Substantial consideration indicates a fee; nominal consideration indicates an easement. *See Kershaw*, 126 P.3d at 24 (finding factor six favored a finding of fee simple title because the consideration "was likely a substantial sum"). In exchange for their conveyances, the Woodins and Mr. O'Meara were granted the "benefits and advantages to accrue . . . from the location, construction, and operation of" the railroad. ECF No. 25 at 26–27 (emphasis omitted). In addition, the Woodins were paid a "rate of Seventy five dollars ($75.00) per acre for all cleared lands actually embraced within the limits of said right-of-way." *Id.* at 27. And Mr. O'Meara received a "sum of one hundred and fifty dollars for the land actually embraced within the limits of said right-of-way and an additional sum of twenty one and three fourths dollars ($21.75) per acre for all land in excess of seven acres that may be embraced in said right-of-way." *Id.* The parties do not argue whether this consideration was nominal or substantial. It is significantly less

consideration than that in *Kershaw* ($1,000 in 1905), which the court found to imply a fee, 126 P.3d at 24, but certainly more than that in *Brown* ($10 in 1906–1910), where the court found insufficient evidence on which to assess whether the consideration indicated an easement or a fee, 924 P.2d at 910, 914. In the absence of additional evidence, the Court cannot determine whether the amount of consideration granted to the Woodins and Mr. O'Meara was substantial or nominal in 1887. Accordingly, this factor is neutral.

Lastly, the seventh factor considers the presence and content of a habendum clause. Where a habendum clause states that the grantee will hold the property and appurtenances "forever," it supports a finding of fee simple. *See Morsbach*, 278 P. at 688 (discussing the habendum clause in *Pac. Iron Works*, 111 P. at 579); *Kershaw*, 126 P.3d at 24 & n.10. Conversely, where the habendum clause "qualif[ies] or limit[s] the interest expressly conveyed," it supports a finding of an easement. *Brown*, 924 P.2d at 914. The Woodin and O'Meara deeds contain identical habendum clauses, which state: "To have and to hold the said premises with the appurtenances unto the said party of the second part and to its successors and assigns forever." ECF No. 25 at 27–28. This "forever" phrasing indicates a fee. *Kershaw*, 126 P.3d at 24 & n.10. Moreover, the habendum clause contains no limitation like the one in *Reichenbach v. Washington Short Line Railway Co.*, 38 P. 1126 (Wash. 1894), where the habendum clause stated the right of way was the railroad's to "have and to hold . . . *so long as* the same shall be used for the operation of a railroad." *Id.* at 1126 (emphasis added). As Plaintiffs note, "[*Reichenbach*] held that the limitations in the habendum clause were inconsistent with . . . an intention to grant a fee interest to the railroad." ECF No. 25 at 16; *see also Reichenbach*, 38 P. at 1126. The same was true in *Pacific Iron Works v. Bryant Lumber & Shingle Mill Co.*, 111 P. 578 (Wash. 1910), where the deed's habendum clause stated that the railroad received the land "forever, *for railway purposes*." *Id.* at 579 (emphasis

added). Therefore, the habendum clauses in the deeds at issue, which state that the Railway received the right of way "forever" with no express limitations, suggest a finding of fee simple title.

Finally, though not included in the list of factors, *Brown* also stated that courts should "look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties." 924 P.2d at 912. In response to the Court's request, Plaintiffs presented evidence of the grantors' subsequent conveyances. *See* ECF No. 35. These subsequent conveyances are not particularly probative with respect to the O'Meara deed but tend to support the parties' intent to convey fee title to the right of way via the Woodin deed.

In the 1887 deed at issue, Mr. O'Meara conveyed to the Railway "[t]he North West-quarter of Section Ten in Township Twenty six North of Range five East." ECF No. 25-4 at 151; *see* ECF No. 38-18 at 4. Subsequently, in 1890, Mr. O'Meara conveyed to Peter Cuniffe the "NW1/4 of Sec. 10, Twp. 26 N., R. 5 E., 160 acres." ECF No. 38-19 at 2. Both deeds seem to concern the same property, with no mention of the right of way in the subsequent conveyance. This could be read as indicating that Mr. O'Meara intended to grant the Railway only an easement across his property, leaving him free to convey the land in fee simple to Mr. Cuniffe. *See Beres*, 97 Fed. Cl. at 791–92 (stating that a grantor's failure to mention the right of way in a subsequent conveyance "can be read as indicating that . . . only an easement was conveyed to the railroad in the source deed" and thus "the original owner and subsequent owners retained property rights in fee, with the freedom to convey the whole acreage, with no exceptions, despite the right of way grant"). However, it could also be read as indicating that the Railway acquired fee simple title, as any subsequent conveyance would likely mention that the property was encumbered by an easement. *See Rasmussen*, 299 F.3d at 1087–88 (finding that "the total failure to except the land subject to

the right of way in the [subsequent conveyance] is not significantly probative of whether or not the parties intended to convey a fee simple estate"); *Beres*, 97 Fed. Cl. at 791–92 ("Logically, the absence of any mention of a right of way in a subsequent[t] conveyance could be interpreted as suggesting that the property interest earlier conveyed to the [railway] was a fee interest."). Due to such "contradictory possibilities," a court "generally attributes some, but limited weight, in the fee versus easement analysis to the absence of a specific reference to the right of way in a subsequent conveyance." *Beres*, 97 Fed. Cl. at 792; *see id.* at 794 (holding that a subsequent deed that "is silent as to the railroad right of way . . . is not considered helpful to understanding the intent" of the original source deed).

The Woodins' subsequent conveyances are more straightforward. In the 1887 deed at issue, the Woodins conveyed to the Railway a right of way through "[t]he South half of the North East quarter and the East half of the North West quarter of Section Nine in Township Twenty six North of Range Five East." ECF No. 25-4 at 123; *see* ECF No. 38-1 at 3. In 1903, the Woodins (this time, Frank and Anna Woodin, rather than Ira and Susan Woodin) conveyed a portion of the property to a different railroad, the Northern Pacific Railway Company (a successor-in-interest to the Railway, *see* ECF No. 25-1 at 32–33), in connection with the construction of what appears to be an extension of the existing rail line. ECF No. 38-2 at 3. That property was located in "the Southeast quarter of the Northeast quarter (S.E./4 of N.E./.4) of Section Nine (9), Township Twenty-Six (26) North, Range Five (5) East W.M." *Id.* The deed continued to describe the conveyance in "metes and bounds as follows:"

> Beginning at the point where the Southeasterly line of the present right of way of the Northern Pacific Railway intersects the south line of the said Southeast quarter of the Northeast quarter (S.E./4 of N.E./4) and running thence East . . . to a point which is 50 feet distant from . . . the center line of the proposed Seattle Belt [L]ine Branch of the Northern Pacific Railway . . . thence running northeasterly and parallel with and 50 feet distant from said center line of the Seattle Belt Line Branch

> . . . to a point in the southeasterly line of the present right of way of the Northern Pacific Railway, thence southeasterly along said right of way line to point of beginning.

*Id.* In the next conveyance, dated 1916, Frank and Anna Woodin conveyed their property to Alice Bronson, including "[a]ll of the N1/2 of the NW1/4 lying N of the [centerline] of the Sammamish River in sec 9 twp. 26 n. r. 5. e.w.m.," "all of the S1/2 of the NE1/4 of [said] sec, lying N of the Northern Pacific Railway Company's [right of way] and the [centerline] of the Sammamish River," and also a portion of the property in the S1/2 of the NE1/4 defined by a metes and bounds description that identifies the railroad right of way as a boundary. ECF No. 38-3 at 3 (alterations in original). This language tends to reflect an intent to exclude the right of way from the conveyance. *See Roeder*, 716 P.2d at 862 ("A metes and bounds description in a deed to property that abuts a right of way is evidence of the grantor's intent to withhold any interest in the abutting right of way . . . .").

In sum, five of the *Brown* factors support a fee and the other two are neutral. Though the subsequent conveyances potentially could be read to provide at least some evidence that Mr. O'Meara conveyed an easement to the Railway, such evidence is not particularly helpful in illuminating the parties' intent and is insufficient to overcome the significant support for finding fee simple title based on the *Brown* factors and the language of the source deed. The subsequent conveyances related to the Woodin deed, on the other hand, further support a fee.

4. <u>Federal Courts Are Divided Over Whether Similar Railroad Deeds Conveyed Fee Title or Easements.</u>

To the extent that federal courts have analyzed the interests conveyed by similar railroad deeds under Washington law, they are divided. For instance, some Court of Federal Claims judges have concluded that deeds granting "a right of way one hundred (100) feet in width" "in consideration of" the benefits from the construction of a railroad conveyed easements because the

stated consideration was equivalent to stating the right of way's purpose. *Haggart*, 108 Fed. Cl. at 88 (finding that a deed made "[i]n consideration of the benefits and advantages to accrue to [the grantor] from the location, construction and operation of the . . . Railway" demonstrated that "the purpose of the conveyance [was] for a railroad"); *Beres*, 97 Fed. Cl. at 783 (holding that a similar granting clause conveyed an easement because the phrase "[i]n Consideration of" the construction and operation of a railroad established "the purpose" of the right of way). The United States Court of Appeals for the Ninth Circuit, however, has held the opposite, adhering instead to the Washington Court of Appeals' decision in *Ray*. *See Rasmussen*, 299 F.3d at 1086 (holding that a deed with a similar granting clause conveyed a fee because "neither the granting nor the habendum clauses" contained "language clearly limiting the use of the land to a specific purpose"); *Hornish v. King Cnty.*, 899 F.3d 680, 694 (9th Cir. 2018) (finding that a deed's statement that it was granted in consideration of the operation of a railroad was merely "precatory" and did not define the right of way's purpose).

Plaintiffs heavily rely on the two Court of Federal Claims cases, arguing that the Government "has not provided any justification to deviate from the holdings of *Haggart* and *Beres*." ECF No. 27 at 12 (capitalization omitted). But Plaintiffs misstate the Government's burden. The Court is not bound by the decisions of other Court of Federal Claims judges, *see Reidell v. United States*, 47 Fed. Cl. 209, 212 (2000); and here, the Court respectfully disagrees with their holdings.[7]

[7] The Court's disagreement with *Haggart* and *Beres* finds support in *Bailey Farm, LLC v. United States*, No. 24-1060L, 2026 WL 2250259, at *15 (Fed. Cl. Aug. 3, 2026), a recent decision in which another Court of Federal Claims judge found the analysis set forth in *Rasmussen* and *Ray* "more consistent with the views of the Washington Supreme Court as expressed in *Brown*."

In *Beres v. United States*, 97 Fed. Cl. 757, 783–85 (2011), a judge of this court—reviewing the same source deed as the Washington Court of Appeals in *Ray*—held that the deed presumptively conveyed an easement because (1) the consideration provided was the benefit to accrue to the grantors from the operation of the railroad, which established the purpose of the conveyance; and (2) the deeds used the term "right of way" in the granting clause and again when describing the property conveyed as a "right of way strip," which further indicated an easement. For the reasons already discussed, the Court disagrees with *Beres*' view of the stated consideration because it merely sets forth the Railway's intended use of the conveyance rather than delimiting the purpose of the conveyance and the interest granted. *See Brown*, 924 P.2d at 913 ("Identifying the purpose of the conveyance . . . does not resolve the issue at hand because a railroad can own rights of way in fee simple or as easements."). In other words, the consideration may have clarified what the parties intended the Railway to do with the property, but under Washington law that does not itself indicate an easement. *See id.* (finding that a deed conveyed fee simple title even where there was "no question" that the railroad "acquired the property for railroad purposes").

Likewise, *Beres* does not convince the Court that it is incorrect to find a fee despite the deeds' use of the term "right of way." In *Beres*, the court found the deed's description of the property as a "right of way *strip*" insignificant in light of the established purpose of the grant. 97 Fed. Cl. at 784. The court emphasized that numerous Washington Supreme Court cases have found deeds to convey easements even where the property was described as a "strip of land" because the deeds also declared the purpose of the grants to be rights of way for a railroad. *Id.* at 784–85. This is a correct statement of the law. *See, e.g.*, *Swan*, 225 P.2d at 201. However, the

Court reaches the opposite conclusion of *Beres* because it finds that the Woodin and O'Meara deeds lack the purpose-limiting language required under Washington law.[8]

*Beres* further diminished the significance of the term "strip" by holding that, as used in the deed, it was not "an independent term" but instead a "physical description of the right of way," 97 Fed. Cl. at 784, 787 (quotation marks omitted), and noting that "courts in the State of Washington have not found that the mere use of the word 'strip' is dispositive to demonstrate intent to convey a fee," *id.* at 787. The word "strip" is indeed not dispositive; but it is nonetheless pertinent to three of the *Brown* factors. *See* 924 P.2d at 912. Here, following the Washington Court of Appeals' interpretation of an almost identical deed in *Ray*, the Court finds the "strip" language relevant to its analysis of the *Brown* factors regardless of whether "strip" is used to describe the right of way, particularly because rights of way can also be conveyed in fee simple. *See Ray*, 86 P.3d at 190; *Brown*, 924 P.2d at 913.

Although *Beres* did not follow *Ray* and held—as Plaintiffs here argue, ECF No. 27 at 14—that *Kershaw*'s footnote discussion distinguishing *Ray* was dictum,[9] the Court disagrees in the

---

[8] Though *Beres* found that the deeds' consideration set forth the limited purpose of the grant, it also repeatedly stated that the *Kershaw* presumption of an easement applies "when the phrase 'right of way' is used in the deed." *E.g.*, *Beres*, 97 Fed. Cl. at 786, 800. In other words, even where there was no additional language establishing the purpose of or limiting the conveyance, the inclusion of the term "right of way" in the granting clause was sufficient to trigger a presumption of an easement. But this misstates the presumption, which requires "language establishing that a conveyance is *for right of way or railroad purposes*," as such language "provides the '*additional language*' which 'expressly limits or qualifies the interest conveyed.'" *Kershaw*, 126 P.3d at 25 (emphases added) (quoting *Brown*, 924 P.2d at 912). Thus, it is not independently sufficient that the granting clause conveyed a "right of way."

[9] *Beres* also attempted to diminish *Kershaw*'s discussion of *Ray* by contending that the court "did not consider both references to the phrase 'right of way' in the . . . source deed when drawing a distinction." 97 Fed. Cl. at 789. The Court is unsure how the *Beres* court could draw such a conclusion from the mere fact that the *Kershaw* footnote did not specifically refer to the *Ray* deed's use of the term "right of way" in the granting clause. *Id.* at 788–89. The Washington

context of this case. Significantly, *Beres* found *Kershaw*'s discussion of *Ray* not dispositive when interpreting the exact same source deed as *Ray* because "the [*Ray*/*Beres*] source deed was not before the [*Kershaw*] court, was included in a footnote as a passing remark, and was not essential to the court's determination that the deed at issue before the court in *Kershaw* conveyed an easement." *Beres*, 97 Fed. Cl. at 789 (holding that "the *Kershaw* footnote [was] dictum"). This does not, however, convince the Court that it must ignore *Kershaw*'s positive citation of *Ray* as an important indicator of how the Washington Supreme Court would interpret a deed similar to those at issue here. *See West*, 311 U.S. at 237. Indeed, the near identicality of the *Ray*, Woodin, and O'Meara deeds further convinces this Court that it should not discount the Washington Supreme Court's decision to distinguish *Ray* rather than cast doubt on its holding.

*Haggart* largely mirrors the analysis in *Beres*, finding that the deeds at issue presumptively conveyed easements because they granted a "right of way one hundred (100) feet in width" and stated the purpose of the conveyance through the description of the consideration—*i.e.*, "the benefits and advantages to accrue to [the grantor] from the location, construction[,] and operation of the . . . Railway." 108 Fed. Cl. at 88 (first alteration added). After reviewing the *Brown* factors—and dismissing the deeds' use of the term "right of way strip" in a similar fashion to *Beres*—the *Haggart* court found that the factors confirmed the deeds conveyed easements. *Id.* at 88–89. The Court's responses to *Beres*'s reasoning apply equally to *Haggart*.

The Court instead agrees, as it must, with the interpretation adopted by the Washington Court of Appeals in *Ray*. As previously explained, the deeds at issue closely resemble the deed in *Ray*, as they conveyed a "right of way" that was later described as a "right of way *strip*" without

---

Supreme Court clearly intended to distinguish *Ray*; absent evidence to the contrary, the Court will not presume that it failed to consider the whole deed at issue in *Ray* when doing so.

further setting forth the purpose of or limiting the conveyance. Like the court in *Ray*, this Court finds these facts support a holding of fee simple title. The Court is convinced that the Washington Supreme Court would not decide otherwise. *See West*, 311 U.S. at 237. Such a conclusion is supported by the Washington Supreme Court's decision in *Kershaw* to distinguish (rather than overrule) *Ray*'s holding, 126 P.3d at 25 n.11, and to rely on *Ray* as proof that the relevant questions of state law had been clearly determined when another Court of Federal Claims judge sought the Washington Supreme Court's guidance on interpreting deeds analogous to those at issue, *Schroeder*, 66 Fed. Cl. at 510.

The Ninth Circuit has similarly concluded that deeds containing language like the Woodin and O'Meara deeds conveyed fee simple title. *See Rasmussen*, 299 F.3d at 1087–88; *Hornish*, 899 F.3d at 694. In *King County v. Rasmussen*, 299 F.3d 1077, 1086 (9th Cir. 2002), the Ninth Circuit held that, although the deed "suggest[ed] a possible intent to create only an easement" because "the term 'right of way' appear[ed] in the granting clause as well as in the legal description," the deed better reflected an intent to convey fee simple title, as "neither the granting nor the habendum clauses contain[ed] language clearly limiting the use of the land to a specific purpose." The court emphasized that "[i]n virtually all cases where Washington courts have found only an easement, the granting or the habendum clauses contained such language." *Id.* *Hornish v. King County*, 899 F.3d 680, 694 (9th Cir. 2018), followed this precedent, again holding that "the 'right of way' language in the granting clause [was] not limiting, and [did] not give rise to the *Kershaw* easement presumption."

*Beres* expressed doubt as to the continuing validity of *Rasmussen* and *Ray*, which were decided before *Kershaw*, contending that *Kershaw* "added a new, significant analytical approach to the precedent in the State of Washington, that a presumption of an easement exists when the

phrase 'right of way' is used to define the purpose of the grant." 97 Fed. Cl. at 800. Plaintiffs have pressed a similar argument. *See* ECF No. 25 at 29 n.15 (noting that "both [*Ray* and *Rasmussen*] were decided before the last pronouncement on the subject by the Washington Supreme Court in *Kershaw*"). The Court disagrees. *Kershaw* stated that the Washington Supreme Court's "*previous cases . . . establish* that whether by quitclaim or warranty deed, language establishing that a conveyance is for right of way or railroad purposes presumptively conveys an easement." 126 P.3d at 24–25 (emphasis added). Thus, *Kershaw* did not purport to fashion a "new, significant analytical approach." *Beres*, 97 Fed. Cl. at 800. Rather, *Kershaw* emphasized that *Brown* did not overrule or otherwise limit the presumption that was already established by the Washington Supreme Court's previous cases; it only noted the need for courts to consider additional factors after determining whether any presumption applies. 126 P.3d at 24–25. And indeed, these prior cases were all cited and analyzed by the courts in *Ray* and *Rasmussen*. *See, e.g.*, *Rasmussen*, 299 F.3d at 1086 (first citing *Swan*, 225 P.2d at 199; then citing *Morsbach*, 278 P. at 687; and then citing *Pac. Iron Works*, 111 P. 578). As a result, even if they did not do so within *Kershaw*'s framework, the Washington Court of Appeals and Ninth Circuit considered the essential question of whether the deeds contained language establishing the purpose of or otherwise limiting the conveyance. *See Hornish*, 899 F.3d at 694. Furthermore, when presented with the opportunity to reject *Ray*'s holding, the Washington Supreme Court in *Kershaw* elected to distinguish the case instead, thus impliedly approving the decision. 126 P.3d at 25 n.11; *see also Hornish*, 899 F.3d at 693 ("[I]n *Kershaw* itself, the [Washington Supreme Court] affirmed the correctness of *Ray*."). Therefore, the Court relies on *Ray* and *Rasmussen* as further support for its holding that the Woodin and O'Meara deeds conveyed fee simple title to the Railway.

For these reasons, the Court agrees with the Government that, as a matter of Washington state law, the deeds conveyed the right of way to the Railway in fee simple. Because Plaintiffs cannot succeed in their takings claim without demonstrating ownership of the land underlying the right of way, the Court need not resolve any of the additional issues presented in the parties' motions and accordingly grants summary judgment for the Government as to the Woodin and O'Meara deeds (Claims 1–9).

### B. The Charles and G.A. Estabrook Condemnations Conveyed Easements to the Railway.

The claims traceable to the condemnations require a separate analysis. According to Plaintiffs, the Washington Supreme Court in *Neitzel v. Spokane International Railway Company*, 117 P. 864 (Wash. 1911), established a "clear, definitive rule" that "a railroad may only acquire an easement when resorting to eminent domain proceedings." ECF No. 25 at 25. The Government, however, argues that *Neitzel* does not dictate the interpretation of the condemnations at issue because they were established prior to the Washington Supreme Court's holding in *Neitzel*. ECF No. 26 at 23. To this end, the Government cites *Brown* for the proposition that "prior to 1911 [when *Neitzel* was decided], it was unclear what interests a railroad could acquire through condemnation," thus making it "possible a railroad could have acquired a fee interest." *Id.* (citing *Brown*, 924 P.2d at 913–14). The Government's reading of *Brown* is incorrect as *Brown* did not alter the general rule prescribed in *Neitzel*, which governs the condemnations at issue and dictates that they conveyed easements only.

In *Neitzel*, the Washington Supreme Court considered whether a railroad acquired an easement or fee simple through the condemnation at issue, which contained language like that of the Estabrook condemnations. Namely, the condemnation stated: "It is considered, ordered, and adjudged that the above-described real estate shall be and the same hereby is appropriated *to the*

*corporate purposes* of the petitioner, the Spokane International Railway Company, and that the legal title thereto shall be and the same hereby is vested in the said [company]." *Neitzel*, 117 P. at 865 (emphasis in original). The court noted that the power of eminent domain "can only be exercised by subordinate agencies when expressly granted within constitutional limitations, through the medium of legislative enactment." *Id.* at 866. Thus, where the legislature "has prescribed by statute the extent of interest to be vested, none further can be taken." *Id.*

In Washington, the statute authorizing railroad companies to exercise the power of eminent domain provides that a condemnation decree shall vest "the legal title . . . in the corporation . . . for corporate purposes." *Id.* at 866–67 (alterations in original) (quoting Rem. & Bal. Code § 927 (1909)).[10] According to the Washington Supreme Court in *Neitzel*, "[t]his language clearly indicates that such a title only, *not a fee simple, but a qualified fee or an easement*, shall be vested as may be necessary for the contemplated corporate purpose." *Id.* at 867 (emphasis added). *Neitzel* thus interpreted the statute as indicating that the legislature "did not intend [that] an unqualified fee-simple should vest in the respondent railway company." *Id.*

In *Brown*, the court was tasked with interpreting deeds that contained some eminent domain language. *See* 924 P.2d at 913 & n.7 (reviewing a deed conveying a "strip of land *together with all rights, privileges and immunities that might be acquired by the exercise of the right of eminent domain*" (emphasis in original)). The plaintiffs in *Brown* argued that the eminent domain

[10] *Brown* identified the year of the statute interpreted in *Neitzel* as 1909, which post-dates the condemnations at issue. Even so, the condemnation statute from 1881 contains the exact same operative language as the 1909 condemnation statute. *Compare* Wash. Code § 2477 (1881) (the court "shall also enter up a judgment or decree of appropriation of the land or right of way in question, thereby vesting the legal title to the same in the corporation for corporate purposes"), *with* Rem. & Bal. Code § 927 (1909) (the court "shall also enter a judgment or decree of appropriation of the land, real estate, premises, right of way, or other property sought to be appropriated, thereby vesting the legal title to the same in the corporation . . . for corporate purposes").

language supported their interpretation that the deeds granted easements, as *Neitzel* dictates that railroads can only acquire easements through condemnation proceedings. *Brown* rejected this argument, noting“[t]he problem with the property owners’ argument is [that] *Neitzel* was decided after all but one of the conveyances at issue in this case.” *Id.* at 913. *Brown* observed that, “[a]t that time, the nature of the interest acquired by a railroad under the condemnation statutes was not entirely clear, given this court had held fee simple title could be acquired by cities and other entities under similarly worded condemnation statutes.” *Id.* at 913–14. Thus, “what meaning the original parties to the deeds attributed the eminent domain language is not apparent.” *Id.*

The analysis in *Brown* thus differs from that at hand, as *Brown* was not interpreting condemnations but instead trying to determine whether the deeds’ eminent domain language spoke to the parties’ intent. Although the court determined that the language did not provide useful evidence of the parties’ intent, it did not hold that condemnations awarded prior to 1911, under the same authorizing language as that interpreted in *Neitzel*, can convey fee simple title. As noted by *Neitzel*, where the legislature “has prescribed by statute the extent of the interest to be vested, none further can be taken.” 117 P. at 866. In accordance with the Washington Supreme Court’s interpretation, then, the Estabrook condemnations could only vest in the Railway easements over the grantors’ land.

### C. The Condemnation Plaintiffs Fail to Demonstrate an Ownership Interest in the Land Underlying the Right of Way.

Because the condemnations could only have conveyed to the Railway easement interests in the land comprising the rail line, the Court must determine whether the plaintiffs that derive their claims from the condemnations (Claims 10–17) can satisfy their burden to show, under Washington’s centerline presumption, that they own the property underlying the rail line. Upon review, the Court finds that these plaintiffs have failed to meet that burden because Washington’s

centerline presumption does not apply without corroborating chains of title, which Plaintiffs failed to produce during discovery and thus cannot rely on to prove ownership. Alternatively, the evidence Plaintiffs *did* timely produce defeats their assertions of ownership because either an intervening road separates their properties from the Railway's right of way or Plaintiffs' immediate grantors excluded the right of way from the relevant conveyance of adjacent land. Either way, Plaintiffs have failed to prove an essential component of their takings claims. Accordingly, Plaintiffs' partial motion for summary judgment on Claims 10–17 must be denied, and the Government's cross-motion granted.

1. <u>Plaintiffs Cannot Rely on the Untimely-Produced Chains of Title Because Their Late Production Was Neither Substantially Justified nor Harmless.</u>

Plaintiffs contend that they own property adjacent to the rail corridor affected by the NITU at issue. *See* ECF No. 25 at 7. To demonstrate ownership of the land underlying that corridor, Plaintiffs must therefore rely on Washington's centerline presumption, which dictates that—in some circumstances—deeds conveying property adjacent to a right of way also convey the land underlying that right of way to its centerline. *See id.* at 32. The Government responds that Plaintiffs cannot invoke the centerline presumption under Washington law without presenting full chains of title. *See* ECF No. 26 at 10–11. Plaintiffs disagree but assert that the argument is beside the point because they ultimately did produce chains of title. *See* ECF No. 27 at 17–19. The Government urges the Court to exclude Plaintiffs' chains of title because they failed to produce them during discovery, instead attaching thousands of pages of title evidence to their summary judgment reply. *See* ECF No. 30 at 12–14; *see generally* ECF No. 27-1–27-4.

The Court agrees with the Government on both fronts. First, Washington's centerline presumption applies only when a party can demonstrate—through chain-of-title evidence—that he acquired his property from the owner of the land underlying the rail corridor. Second, Plaintiffs'

failure to produce chains of title during discovery forecloses Plaintiffs' reliance on them now. Without this evidence, Plaintiffs cannot demonstrate ownership of the land underlying the rail corridor, and thus Claims 10–17 fail as a matter of law.

*a. Washington's centerline presumption requires full chains of title.*

The parties agree that the Washington Supreme Court's decision in *Roeder Co. v. Burlington Northern, Inc.*, 716 P.2d 855 (Wash. 1986), controls. *See* ECF No. 37 at 17:19–22, 66:3–6. There, the court extended the centerline presumption from private streets and rivers to railroad rights of way. *See Roeder*, 716 P.2d at 861. In doing so, the court recognized that the "major concern in examining conveyances of abutting land is, of course, to determine the intent of the parties to the deed." *Id.* The centerline presumption, *Roeder* explained, rests on the practical observation that grantors who convey land abutting rights of way typically do "not intend to retain a narrow strip of land which could be of use only to the owner of the adjoining land." *Id.* The court then defined the presumption as follows:

> [T]he conveyance of land which is bounded by a railroad right of way will give the grantee title to the center line of the right of way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear.

*Id.* That said, *Roeder* expressly cabined the presumption's reach, holding that "[a] property owner receives no interest in a railroad right of way simply through ownership of abutting land." *Id.* at 862. Instead, adjacent landowners must further demonstrate that they "received [their] property from the owner of the right of way." *Id.* Otherwise, the presumption is "inapplicable." *Id.*

Courts interpreting *Roeder* disagree about the evidence needed to show that property was received "from the owner of the right of way." *Id.* In *Haggart*, on which Plaintiffs rely, the court held that *Roeder* is satisfied with evidence that (1) the railroad acquired an easement in the rail corridor, and (2) the plaintiffs owned property adjacent to the rail corridor at the time of the alleged

taking. 108 Fed. Cl. at 84. *Haggart* thus required the plaintiffs to produce only "the original deeds granting a right-of-way to the predecessor railroad" and "the deeds that show plaintiffs owned the property abutting the right of way at the time the NITU was issued." *Id.* According to *Haggart*, so long as nothing in those two documents "evince[d] the grantor's intent to withhold any interest in the abutting right of way," the centerline presumption applies. *Id.*

Other courts, by contrast, have characterized Washington's centerline presumption as being "of limited applicability." *Hornish*, 899 F.3d at 698. In *Kaseburg v. Port of Seattle* (*Kaseburg I*), No. C14-0784 JCC, 2016 WL 4440959 (W.D. Wash. Aug. 23, 2016), on which the Government relies, the court interpreted *Roeder* to require "that all Plaintiffs prove their chain of title back to the original grantor." *Id.* at *6 (quotations omitted). *Kaseburg I* grounded this chain-of-title requirement in *Roeder*'s express limitation, explaining that the centerline presumption "is *inapplicable* where the adjoining landowner presents no evidence of having received his or her property from the owner of the right of way." *Id.* at *7 (emphasis in original) (quoting *Roeder*, 716 P.2d at 862). According to *Kaseburg I*, this language "makes clear" that parties must "provid[e] chain of title evidence to support the centerline presumption." *Id.* On appeal, the Ninth Circuit agreed and affirmed the district court's grant of summary judgment in favor of the defendants. *See Kaseburg v. Port of Seattle (Kaseburg II)*, 744 F. App'x 356, 359 (9th Cir. 2018).

*Kaseburg I* has the better reading of the presumption's application. Under *Roeder*, the centerline presumption is an interpretive tool that dictates how much land a particular deed conveys—that is, it operates on a deed-by-deed basis. *Roeder*, 716 P.2d at 861 (explaining that the presumption illuminates "the intent of the parties *to the deed*" (emphasis added)); *see also* ECF No. 25 at 32 (Plaintiffs describing presumption as "a rule of construction"). A grantor who owns land underneath a right of way and executes a deed conveying an adjacent parcel presumptively

intends to convey his interest in land underlying the right of way. *See Roeder*, 716 P.2d at 861. But that is true only for deeds that meet two conditions: first, the deed must refer to the right of way "as a boundary without clearly indicating that the side of the right of way is the boundary," and second, the grantor of the deed must own the land under the right of way. *See id.* To satisfy condition two, a grantee must show that the right of way conveyed through the relevant chain of title such that his grantor had the requisite ownership interest. Any deed in the chain that expressly excluded—or failed to presumptively include—the land under the railway would not have conveyed such land. In either case, the grantee could not have acquired the land underlying the railway to the centerline because the immediate grantor could not have "convey[ed] a greater interest in real estate than" he owned. *See v. Hennigar*, 213 P.3d 941, 944 (Wash. Ct. App. 2009).

The Colorado Supreme Court also agrees with this interpretation of *Roeder*. Answering a certified question from the Court of Federal Claims in a rails-to-trails case involving Colorado law, the court held that "under the common law centerline presumption, an adjacent landowner may claim title to an abandoned right-of-way only if he or she can trace title to the owner of the fee underlying that right-of-way." *Asmussen v. United States*, 304 P.3d 552, 559 (Colo. 2013). Drawing on Washington law, the court explained that *Roeder* "supports" the conclusion that "absent . . . chain of title, the adjacent landowner cannot rely on the centerline presumption to claim ownership to the centerline of an abandoned right-of-way." *Id.* at 560 (citing *Roeder*, 716 P.2d 855). "This is because it is possible that a grantor in that chain of title may have manifested an intent to convey only the property abutting the right-of-way but not the interest underlying it." *Id.* ("[I]n the context of a Fifth Amendment takings claim, it is especially important that the plaintiff trace title to a grantor in the chain of title who actually owned the land underlying the right-of-way."); L. Griffith & K. Simmons, 11 C.J.S. *Boundaries* § 80 (2026) ("[T]o claim

ownership in the abandoned right of way under the centerline presumption, the adjacent landowner must trace title to the owner of the fee underlying that right of way.").[11]

*Roeder* does not upset the settled rule that a plaintiff asserting a takings claim bears the burden of demonstrating ownership of the property allegedly taken. *See Thomas v. United States*, 106 Fed. Cl. 467, 478 (2012) ("The burden rests on plaintiffs to prove that they owned a valid property interest . . . at the time of the taking."). Indeed, presumptions are no more than "evidentiary devices that enable a factfinder to presume the existence of an 'ultimate' or 'elemental' fact upon proof of 'evidentiary' or 'basic' facts." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Cnty. Ct. of Ulster v. Allen*, 442 U.S. 140, 156 (1979)). The "ultimate" fact here is whether Plaintiffs own the land underlying the railway; the "basic" fact is whether Plaintiffs acquired their property from a grantor who did. When Plaintiffs here invoked the centerline presumption to meet that burden, *Roeder* required them to show that they received their property "from a grantor that owned the right of way." *Kaseburg I*, 2016 WL 4440959, at *7. And because Plaintiffs' property has passed through multiple successive owners since the condemnation proceedings, full chains of title were necessary to demonstrate that the property

[11] To be sure, at least one Federal Circuit decision rejected the argument that the centerline presumption requires plaintiffs to "affirmatively establish, through pre-platting evidence, that the [plaintiffs' predecessors-in-title] owned the land underlying" the railroad. *Castillo v. United States*, 952 F.3d 1311, 1324 (Fed. Cir. 2020). But *Castillo* rested on Florida law. *See id.* ("The government has not shown that Florida law required the landowners, in order to withstand summary judgment, to present affirmative proof of [the plaintiffs' predecessors'] ownership of the at-issue part of the railroad corridor . . . ."). Unlike Washington, Florida considers mere ownership of adjacent property sufficient to invoke the centerline presumption. S*ee Jacksonville, T. & K.W. Ry. Co. v. Lockwood*, 15 So. 327, 329 (Fla. 1894) (recognizing that the centerline presumption applies only when "the grantor himself has the title" to the land under the right of way, but holding that courts should presume, "in the absence of proof to the contrary, that [the grantor] owned to the center of the street"). *Roeder* holds the opposite: adjacency alone does not trigger the presumption. 716 P.2d at 862. If anything, *Castillo* confirms that ownership interests in cases of this kind turn entirely on state law. *See Preseault I*, 494 U.S. at 20 (O'Connor, J., concurring).

underlying the Railway's easement transferred with each grant in the chain. *See Roeder*, 716 P.2d at 861 (explaining that a grantee takes title to the center line of the right of way only "if the grantor owns so far"). Of course, chain-of-title evidence may also "rebut" the presumption—for instance, if it were to show that any of Plaintiffs' predecessors-in-interest expressly reserved the land underlying the right of way. *See id.* Without chains of title, however, Plaintiffs cannot satisfy their burden to prove either the ultimate or basic facts of ownership.

Plaintiffs' counterarguments are unpersuasive. First, Plaintiffs maintain that they have "demonstrated that the centerline presumption applies based simply on their ownership of land adjacent to the corridor authorized for trail use." ECF No. 27 at 17. *Roeder* expressly holds otherwise: "A property owner receives no interest in a railroad right of way simply through ownership of abutting land." 716 P.2d at 862.

Second, Plaintiffs suggest that because the condemnation proceedings resulted in an easement, "someone necessarily owns fee title to the land underlying the right-of-way other than the easement holder." ECF No. 27 at 18 (emphasis omitted). Plaintiffs, however, cannot satisfy their burden to prove that they own the property in fee simple merely by observing that the Railway does not. *Cf. BHL Props., LLC v. United States*, 135 Fed. Cl. 222, 229 (2017). "[I]t is [the plaintiff's] burden to prove [] ownership . . . ; it is not the government's burden to disprove it." *Id.* (demanding chain-of-title evidence when "the government clearly signaled that it intended to challenge [the plaintiff's] ownership interest"). Absent chains of title establishing that Plaintiffs received a fee interest in the right of way from grantors who owned the right of way, they have not satisfied an essential element of their claims.

Third, Plaintiffs observe that the purpose of the centerline presumption is to promote efficient use of land, lessen litigation, and honor grantors' probable intent. *See* ECF No. 25 at 32.

They argue that the presumption avoids the need to "unwind a complicated mess of title to a stranded strip of land." ECF No. 27 at 18. These may be compelling policy arguments, but demanding chains of title serves equally compelling interests. Indeed, *Roeder* cautioned that uncritical application of the centerline presumption would risk the inadvertent transfer of property from one person to another. *See* 716 P.2d at 862 (quoting *Standard Oil Co. v. Milner*, 152 So. 2d 431, 438 (Ala. 1962)); *see also* Danaya C. Wright, *Doing a Double Take: Rail-Trail Takings Litigation in the Post-*Brandt Trust *Era*, 39 Vt. L. Rev. 703, 728–29 (2015) (criticizing takings plaintiffs' overreliance on the centerline presumption as inconsistent with the property they reasonably expected to acquire). In applying Washington common law to determine Plaintiffs' property interest, this Court must respect and follow the policy judgments of the Washington Supreme Court.

Finally, Plaintiffs argue that they have "attached abbreviated chains of title . . . that confirm that Plaintiffs' title does indeed trace back to the grantors identified in the applicable source conveyances." ECF No. 27 at 18. Such evidence may have sufficed under *Haggart*, but Washington law demands more. Plaintiffs' abbreviated chains of title suggest that certain parcels comprising their property were affected by the 1887 condemnation proceedings against Charles and G.A. Estabrook. *See, e.g.*, ECF No. 25-5 at 140. The fact that a remote grantor owned the property underlying the right of way, however, cannot satisfy Plaintiffs' burden under *Roeder*. Plaintiffs' property has passed through various owners in the 140 years since the condemnation proceedings took place; the abbreviated chains of title shed no light on successive ownership interests and therefore fail to demonstrate that the property Plaintiffs *now own* was acquired "from

the owner of the right of way."[12] *Roeder*, 716 P.2d at 862; *see also Kaseburg I*, 2016 WL 4440959, at *7. Put another way, neither document in Plaintiffs' abbreviated chains of title satisfies both of *Roeder*'s conditions. The condemnation awards were not grants to Plaintiffs, so the awards did not convey any interest to them at all. And the final deeds in the chain—the current deeds to Plaintiffs—are silent about the grantors' ownership in the land underlying the right of way.[13]

Accordingly, under Washington law, Plaintiffs must offer chains of title to demonstrate that the grantors from whom they received their property owned the land underlying the rail line.

*b. Plaintiffs' failure to produce the chains of title until summary judgment briefing was not substantially justified or harmless.*

RCFC 26 imposes several affirmative—and continuing—obligations on parties during the discovery phase. Pursuant to RCFC 26(a)(1)(A)(ii), a party must initially disclose "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Additionally, in responding to

[12] Plaintiffs overstate the significance of the abbreviated chains of title, as confirmed by the documents themselves. The abbreviated chain of title for Claim 10, for instance, states that the "George N. Estabrook" condemnation was the only "[c]onveyance[] affecting" the property "prior to the recording of the Plat of Bear Creek Addition to Day City and Plat of Day City." ECF No. 25-5 at 140. That plat, in turn, was created on May 9, 1890. ECF No. 25-6 at 35. Accordingly, the abbreviated chains of title shed no light on the scope of any conveyances that occurred from 1890 to the present.

[13] To be clear, the plaintiffs in *Roeder* offered virtually no evidence to support their reliance on the centerline presumption, leaving the court unsure about how the plaintiffs acquired their property. *See* 716 P.2d at 862. Here, by contrast, Plaintiffs offered both the condemnation awards (which granted an easement interest in the rail corridor to the Railway) and their own deeds (which conveyed a fee simple interest in purportedly adjacent land to Plaintiffs). *See Lucier v. United States*, 138 Fed. Cl. 793, 801–02 (2018) (discussing, but ultimately rejecting, a similar objection). Plaintiffs have thus offered more evidence than was before the court in *Roeder*. This does not alter the Court's conclusion, however, because Plaintiffs' evidence does not satisfy *Roeder*'s command to demonstrate the ownership of Plaintiffs' predecessors-in-interest. In other words, *Roeder* turns not merely on the *amount* of evidence provided but also the *type* of evidence—namely, its propensity to show that Plaintiffs' immediate grantors owned the land underlying the rail corridor.

document requests, a party must disclose all responsive documents to the extent they are non-privileged, relevant to any party's claim or defense, and proportional to the needs of the case. RCFC 26(b)(1). If a party later "learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," the party "must supplement or correct its disclosure or response . . . in a timely manner." RCFC 26(e)(1)(A).

Plaintiffs' production of their chains of title in the eleventh hour fell short of these obligations. At the outset, Plaintiffs did not identify full chains of title in their initial disclosures, served on September 22, 2023. ECF No. 30 at 12 (citing Pls.' RCFC 26(a)(1) Initial Discl. at 5–6, ECF No. 30-1). Six months later, in March 2024, the Government requested that Plaintiffs "produce all deeds in each Plaintiff's chain-of-title for the Subject Properties, including the Railroad Corridor." *Id.* at 13 (quoting Gov't's Req. for Prod. of Docs. at 11, ECF No. 30-1). Plaintiffs refused, stating that "[t]he original source conveyance to the railroad and the current ownership deed [have] been produced and any such additional title research is the government's burden." ECF No. 30-1 at 11. In the months that followed, the parties discussed their competing positions on liability and issues with discovery, and the Government repeatedly asserted its position that Plaintiffs had not produced sufficient evidence of ownership. *See* ECF No. 30-2 at 6–7, 9–10, 12–18, 21. After reaching an impasse on the liability question, the parties agreed to proceed to summary judgment in August 2024. The Government, however, explicitly "advised Plaintiffs that their claims failed without evidence that Plaintiffs acquired their properties from the owner of the right of way" and only agreed to proceed to summary judgment briefing "*on the understanding that Plaintiffs intended to produce no additional documents to prove ownership*." ECF No. 30 at 13 (emphasis in original) (citing ECF No. 30-2 at 2–3). Despite the Government's

previous discovery request for chains of title, its stated position that such evidence is required under Washington law, and its objection to Plaintiffs' relying on any undisclosed documents to support dispositive motions, Plaintiffs only began their efforts to obtain full chains of title after the Court had issued an order setting a summary judgment briefing schedule. *See* ECF No. 37 at 22:19–23:5. Plaintiffs produced their first two chains of title just two days before filing their affirmative motion, and they produced the remainder only a few days in advance of the Government's cross-motion and response deadline. *Id.* at 91:4–13.

This untimely production of documents violated RCFC 26(a)(1) and (e). Plaintiffs attempt to excuse their delay by arguing that they were not obligated to identify or produce evidence they did not yet possess and that they tendered the chains of title as soon as they received them from Fidelity National Title of Washington ("Fidelity Title"). *See id.* at 23:13–21. But RCFC 26 does not accommodate delays of a party's own making. While the Court's rules permit a party to "make its initial disclosures based on the information then reasonably available to it[,] [a] party is not excused from making its disclosures because it has not fully investigated the case[.]" RCFC 26(a)(1)(E). Even if Plaintiffs had not yet obtained chains of title as of the date of their initial disclosures or response to the Government's discovery request, they were obliged to "supplement or correct [their] disclosure or response . . . *in a timely manner*" once they "learn[ed] that in some material respect [their] disclosure or response [was] incomplete or incorrect." RCFC 26(e)(1)(A). Put simply, Plaintiffs cannot consciously refrain from obtaining evidence necessary to prove their case, only to turn around and rely on their lack of possession as an excuse for failing to produce the evidence during discovery. *See also* ECF No. 37 at 69:17–22 (Government counsel arguing that "this [chain of title evidence] is something that the Plaintiff[s] should have looked to obtain before the parties set the briefing schedule and in the course of discovery"). By waiting until

discovery had closed and the parties began briefing summary judgment to seek and ultimately produce the chains of title in October and November 2024, *see* ECF No. 30 at 12–13, Plaintiffs failed to timely disclose and produce the documents and to supplement their disclosures in violation of RCFC 26(a)(1) and (e).

Given Plaintiffs' discovery violation, the Court must determine the appropriate sanction under RCFC 37. In general, a party's failure to disclose or supplement evidence under RCFC 26(a) or (e) requires exclusion—that is, forbidding the party from relying on that evidence in a later motion "unless the failure was substantially justified or is harmless." RCFC 37(c)(1); *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006) ("Circuit courts applying the federal rule have held that the sanction of exclusion is automatic and mandatory unless the party violating [Rule] 26 shows that the violation was justified or harmless."); *see also Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005) (holding that there is no "sliding scale of sanctions under Rule 37," thus a court is "obligated to exclude the offered evidence" when faced with a RCFC 26 violation unless it was substantially justified or harmless (citing *Williams v. Morton*, 343 F.3d 212, 222 (3d Cir. 2003))).[14] The violating party bears the burden to prove that the violation was justified or harmless, *Zoltek*, 71 Fed. Cl. at 167, and "[t]he court has wide discretion to determine whether a non-disclosing party's conduct" meets that standard, *Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 664 (2024). *See also Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988) ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court.").

---

[14] RCFC 37(c)(1) "is almost identical to [Federal Rule[] of Civil Procedure ("FRCP")] 37(c)(1)"; and thus, "interpretation of the federal rule informs the Court's analysis of RCFC 37(c)(1)." *Zoltek*, 71 Fed. Cl. at 167.

Judges of this Court have considered a number of factors in determining whether the failure to disclose evidence was substantially justified or harmless, including "(1) surprise to the party against whom the evidence would be offered; (2) the importance of the information withheld; and (3) the explanation for failure to disclose the information." *Tritek Techs., Inc. v. United States*, 63 Fed. Cl. 740, 750 (2005) (compiling the factors from various circuit court tests interpreting FRCP 37(c)(1)); *see also Abbey v. United States*, 132 Fed. Cl. 307, 311 (2017) (citing *Zoltek*, 71 Fed. Cl. at 168) (also listing as factors the prejudice to the party against whom the evidence is offered, the likelihood of disruption of trial, and the possibility of curing the prejudice). Upon consideration of these factors, the Court finds that Plaintiffs were not substantially justified in delaying their efforts to obtain chain-of-title evidence and that the Government suffered harm because it received the vast majority of such evidence (roughly 900 pages) only two days in advance of its affirmative briefing deadline and after the discovery period had closed.

The Court starts its analysis by reviewing whether Plaintiffs' failure to timely disclose the chains of title was substantially justified. This inquiry asks whether a party's failure to produce evidence during discovery was grounded in a reasonable interpretation of their discovery obligations. *See Zoltek*, 71 Fed. Cl. at 170; *see also id.* at 168 (noting that the party's explanation for its failure to disclose evidence informs the substantial justification inquiry). Under that standard, the Court finds that Plaintiffs' delay in producing the chain-of-title evidence was not substantially justified, especially since the Government clearly signaled its intent to challenge Plaintiffs' proof of ownership. Plaintiffs knew the Government would argue that chains of title are necessary to invoke the centerline presumption under Washington law and would seek summary judgment against Plaintiffs if they attempted to do so without such evidence. ECF No. 30 at 13 (citing ECF No. 30-2 at 2–3). To be sure, Plaintiffs disagreed with the Government's

reading of Washington law, instead contending that "plaintiffs must only present the original deeds granting a right-of-way to the predecessor railroad and the deeds that show plaintiffs owned the property abutting the right of way at the time the NITU was issued." ECF No. 27 at 19 (quoting *Haggart*, 108 Fed. Cl. at 83–84); *see also* ECF No. 37 at 26:23–27:5 (Plaintiffs' counsel attempting to justify their delay by arguing that Plaintiffs "were relying . . . on Judge Lettow's opinion in *Haggart*"). But Plaintiffs' reliance on *Haggart* as justification for refusing the Government's discovery request for chains of title was not reasonable. RCFC 26 did not allow Plaintiffs to object to producing chains of title based on their interpretation of a disputed evidentiary obligation, only to walk back their objection and produce new evidence in the middle of briefing when the Government challenged the sufficiency of their evidence (as Plaintiffs knew it would).

Moreover, *Haggart* is not the sole authority interpreting Washington's centerline presumption. Plaintiffs were fully aware of contrary case law, including *Kaseburg I*—litigated by Plaintiffs' counsel here—which held that *Roeder* "makes clear" that chains of title are needed. 2016 WL 4440959, at *7. The Ninth Circuit upheld the district court's decision in *Kaseburg I*, affirming that "[t]he centerline presumption [did] not apply because Plaintiffs-Appellants failed to introduce chains of title and '[a] property owner receives no interest in a railroad right of way simply through ownership of abutting land.'" *Kaseburg II*, 744 F. App'x at 359 (third alteration in original) (quoting *Roeder*, 716 P.2d at 862). Thus, contrary to Plaintiffs' assertions, *see* ECF No. 37 at 26:25–27:2 (Plaintiffs' counsel claiming that he has "never had to do [chains] of title like this"), the Government's insistence on chains of title was not unexpected. Indeed, the Court finds that it was objectively predictable.[15] *See* ECF No. 30 at 14 (emphasizing that "[t]he plaintiffs

[15] In remarkably similar fashion, Plaintiffs' counsel belatedly produced chains of title during summary judgment briefing in *Kaseburg I*. 2016 WL 4440959, at *8. The district court excluded the undisclosed evidence. *Id.* Granted, the non-compliance in *Kaseburg I* also violated

in *Kaseburg I* were represented [by] the same law firm and the same lead counsel as Plaintiffs in this case" and thus *Kaseburg I* "demonstrates there can be no excuse in this case for Plaintiffs' late production of the Fidelity documents").

In short, Plaintiffs made a strategic litigation choice to avoid the time and expense required to produce chains of title to support their claims. They cannot avoid the consequences of that choice by ultimately providing such evidence after reading the Government's summary judgment brief, which argued that Plaintiffs' failure to offer chains of title defeats their claims. *See* ECF No. 37 at 27:6–10 (Plaintiffs' counsel arguing that obtaining chains of title is "a massive endeavor, massive expense, massive resources," so "until we were sure that the Government was going to stick with this argument, we did not want to go to that level and expend those resources").

Nor was Plaintiffs' failure to timely produce the chains of title harmless.[16] This inquiry asks whether the discovery violation causes "surprise or prejudice" to the innocent party. *Zoltek*, 71 Fed. Cl. at 168. Here, it did. Plaintiffs' chains of title comprise nearly 1,000 pages, all of which

---

a prior discovery order directing the plaintiffs to produce chains of title. *Id.* While this Court did not issue such an order in this case, an "explicit warning is not always necessary" before imposing sanctions; parties are "already put on notice of the possibility of" sanctions by the discovery rules. *Consumer Fin. Prot. Bureau v. Nexus Servs., Inc.*, 156 F.4th 443, 456 n.10 (4th Cir. 2025) (quoting *Mey v. Phillips*, 71 F.4th 203, 218 (4th Cir. 2023); *see also Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009) (holding that an "explicit warning" was "not a prerequisite" to the trial court's imposition of a dismissal sanction). Plaintiffs here were likewise on notice that RCFC 37 requires exclusion of evidence that should have been disclosed under RCFC 26(a) and (e). *See* RCFC 37(c)(1).

[16] Though Plaintiffs stated in a footnote of their opening brief that they were working to obtain full chains of title, *see* ECF No. 25 at 30 n.16, this does not excuse their discovery violation. Indeed, the Government was no less prejudiced by Plaintiffs' untimely production merely because Plaintiffs telegraphed that they would "attach the records" to their response and reply "if acquired." *Id.* As stated, the Government made clear to Plaintiffs that they believed chains of title were required under Washington law, agreed to proceed to summary judgment briefing on the understanding that no such evidence would be produced, and was deprived of the opportunity to conduct their own discovery into such evidence. *See* ECF No. 30 at 14.

the Government was forced to review on an extremely expedited basis, even considering the extension of its reply brief deadline. *See* ECF No. 37 at 71:20–22 (Government counsel noting that the Government "might have . . . discussed" more title documents "if [it] had time to further delve into the voluminous title documents that were late disclosed"). Indeed, Plaintiffs themselves chose not to meaningfully address their own chains of title in their briefing, as doing so would be burdensome. *See* ECF No. 27 at 20 ("Plaintiffs will not go through each instrument here, as there are hundreds of instruments in each chain, but Plaintiffs note that no instrument reserves or excepts the railroad right-of-way."). *But see* RCFC 56(c)(1)(A) (requiring summary-judgment briefs to "cit[e] to particular parts of materials in the record" when "asserting that a fact cannot be or is genuinely disputed").

Plaintiffs' delay, moreover, deprived the Government of the opportunity to conduct its own discovery into the chains of title. According to the Government, had it known Plaintiffs intended to rely on their chains of title in connection with summary judgment briefing, it "would have insisted on adequate time to review the Fidelity documents and to undertake any additional discovery it deemed necessary." ECF No. 30 at 14; *see also* ECF No. 37 at 71:10–17 (Government counsel noting that the Government was harmed because it could not conduct further discovery on the title documents to "verify that they were correct" or "ask further questions about them").

In sum, Plaintiffs have not met their burden to demonstrate that their late production of evidence was substantially justified or harmless. As a result, the Court agrees with the Government that Plaintiffs' full chains of title must be excluded from the Court's consideration of the parties' cross-motions for summary judgment.[17] Because chains of title are necessary to invoke

[17] This opinion and order includes limited citations to Plaintiffs' untimely chain-of-title evidence where such evidence provided useful background information (as in the case of the condemnation awards), contained legible copies or transcriptions of documents provided with

Washington's centerline presumption, Plaintiffs' cannot prove an essential element of their claims—*i.e.*, that they held a "compensable property interest" in the land underlying the railroad at the time of the alleged taking. *Zanzarella v. United States*, 183 Fed. Cl. 354, 361 (2026). Accordingly, the Court grants summary judgment for the Government as to the condemnation plaintiffs (Claims 10–17).

2. Alternatively, Claims 10, 11, and 13–17 Fail Because the Evidence Plaintiffs Did Timely Produce Fails on Its Own Terms to Demonstrate Ownership.

Plaintiffs have failed to demonstrate a property interest in the rail corridor for three additional reasons. First, with respect to Claims 10, 11, and 13–16, the State of Washington may have acquired the intervening Woodinville-Snohomish Road in fee simple by operation of law, which would sever any adjacency between Plaintiffs' properties and the rail corridor and foreclose their reliance on the centerline presumption. Second, even if Washington acquired only an easement interest in the intervening road, the deeds associated with Claims 10, 11, and 13–16 did not grant Plaintiffs any interest in the land underlying the road or at best the deeds support a claim that Plaintiffs own the land underlying the road to the centerline, which also defeats their reliance on the presumption to demonstrate ownership of the rail corridor to its centerline. Third and finally, the plaintiff bringing Claim 17 acquired its property adjacent to the rail corridor via a deed that includes a metes and bounds description that rebuts the presumption.[18]

---

Plaintiffs' opening motion, or where the Court specifically requested to review certain documents (as in the case of subsequent conveyances).

[18] The Government also argues that Plaintiffs cannot rely on the centerline presumption because the City of Woodinville ("City") similarly claims fee simple title over the Woodinville Segment. *See* ECF No. 26 at 11. To that end, the Government cites a quiet title action addressing a freight easement for the same segment, in which the Washington Court of Appeals held that "the City owns the property burdened by the easement, in fee title." *Id.* at 14 (quoting *City of Woodinville v. Eastside Cmty. Rail LLC*, 510 P.3d 355, 361 (Wash. Ct. App. 2022)). The Court need not address this alternative argument because Plaintiffs' claims fail for other reasons.

a. *Plaintiffs bringing Claims 10, 11, and 13–16 cannot demonstrate ownership because the State of Washington may have acquired the intervening road in fee simple as a matter of law.*

With regard to Claims 10, 11, and 13–16, Plaintiffs face another obstacle in their attempt to invoke the centerline presumption: the Woodinville Snohomish Road (also known as the Woodinville Snohomish Highway or Secondary State Highway 1A, ECF No. 26 at 20 n.7), which runs between the plaintiffs' property and the railroad right of way.[19] *Id.* at 21–22. The Government argues that an unresolved question exists as to whether the State of Washington owns this road in fee simple, *id.*, citing the Revised Code of Washington, which provides:

> All public highways in the state of Washington which have been designated to be primary state highways or secondary state highways or classified as primary roads and which have been constructed and improved and maintained for a period of seven years prior to April 1, 1937, at the expense of the state shall operate to vest in the state of Washington all right, title, and interest to the right-of-ways thereof, including the roadway . . . .

Wash. Rev. Code § 47.04.040 (2024) (codifying 1937 Wash. Sess. Laws 151–52). According to the Government, § 47.04.040 establishes that, if the Woodinville Snohomish Road was constructed, improved, and maintained by the State since April 1, 1930, "the state owns the road and the land under it, and the properties of these Plaintiffs are not adjacent to the right of way." ECF No. 26 at 22. The Government further cites a Washington State Department of Transportation webpage detailing a historic Washington state highway that was administratively combined in

[19] The parties' briefing leaves unclear whether Claim 12, which belongs to Greenbaum Associates, borders the Woodinville Snohomish Road. Plaintiffs' exhibits, for instance, indicate that this property instead borders "139th Ave NE." ECF No. 25-6 at 39; *see id.* at 36 (listing the property's address as "18815 139th Ave NE"). Plaintiffs also assert that an unspecified "intervening road" was dedicated by the plat to which Claim 12's deed refers. ECF No. 25 at 37 n.19. The Government's cross-motion and response, by contrast, explicitly states that the Woodinville Snohomish Road "intervenes between . . . claims 10–16," ECF No. 26 at 22—a statement Plaintiffs do not contest in their reply, *see* ECF No. 27 at 21–23. Given Plaintiffs' evidence, the Government appears to have erroneously included Claim 12 in this argument.

1937 to create Secondary State Highway 1A from Woodinville to Blaine, Washington. *See id.* It acknowledges, however, that there is no evidence concerning the construction, improvement, and maintenance of the specific portion of that road that intervenes between the properties for Claims 10, 11, and 13–16 and the railroad right of way. *See id.*

Plaintiffs do not contest the Government's interpretation of the Washington statute,[20] nor do they present evidence demonstrating that the road was not constructed, improved, and maintained by the State of Washington for a seven-year period since, at the latest, April 1930. In fact, they seem to concede these points. *See* ECF No. 27 at 21 (noting the Government's argument that the statute "vests title in the State as to certain roads maintained and constructed for at least seven years prior to the statute's enactment in 1937" and admitting that "[i]t appears true that [the] Woodinville-Snohomish Road was established at least seven years prior to § 47.04.040's enactment"). Plaintiffs instead argue that "regardless" of whether the statute "actually operated to extinguish adjacent landowners' fee interest" in the Woodinville Snohomish Road, it "do[es] not rebut the centerline presumption as to the railroad right-of-way because the centerline presumption is only rebutted with evidence that demonstrates a grantor's intent to reserve or except the land within a public right-of-way." *Id.*

[20] At oral argument, Plaintiffs argued that "if you look at the statute, it also doesn't say fee, it just says road" and Washington law is clear "that a road is an easement." ECF No. 37 at 108:7–14. If Plaintiffs wanted to contest the Government's interpretation of § 47.04.040, they were required to do so in their response and reply. By waiting until oral argument, Plaintiffs have waived any arguments as to the proper interpretation of § 47.04.040. *Brooks Range Cont. Servs., Inc. v. United States*, 101 Fed. Cl. 699, 708–09 (2011). In any event, Plaintiffs' argument ignores the plain language of the statute, which broadly vests the State of Washington with "*all* right, title, and interest"—which would include fee simple—to certain state highways and roads. Wash. Rev. Code § 47.04.040 (emphasis added). Indeed, the provision's heading expressly reads, "Title to rights-of-way vested in state." *Id.*

Plaintiffs' argument misses the mark. The Government is not presenting this evidence to *rebut* the centerline presumption; it presents it to show that Plaintiffs cannot rely on the centerline presumption *at all*. As set forth in *Roeder*, the centerline presumption applies only to land "bounded by a railroad right of way." 716 P.2d at 861. If the intervening road is owned by the State of Washington in fee, then Plaintiffs' property is not "bounded by a railroad right of way." Accordingly, Plaintiffs cannot rely on the centerline presumption to demonstrate their ownership of the rail corridor.

Plaintiffs admit that "[t]he statute may have impacted the analysis if Plaintiffs relied exclusively upon their adjacency," but assert that the chains of title further confirm that the condemnation plaintiffs maintain ownership of the land underlying the railroad right of way because they show that no one else owns the land. ECF No. 27 at 22–23. This argument also misses the mark. As already discussed, Plaintiffs cannot rely on the chains of title, as their failure to produce them until the middle of briefing was neither substantially justified nor harmless. In any event, although it may be tempting to assume Plaintiffs own the land underlying the rail corridor—rather than leave its ownership unresolved—Plaintiffs bear the burden to demonstrate their ownership of the property giving rise to their takings claim. *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) ("To maintain a cognizable claim for a Fifth Amendment taking, a plaintiff must establish that he possessed an enforceable property right that was taken by the government for public purposes without just compensation."). To satisfy their burden, Plaintiffs "must do more than simply cite the absence of evidence in the record that another individual currently owns the land underlying" an adjacent right of way. *BHL Props.*, 135 Fed. Cl. at 229.

*b. Claims 10, 11, and 13–16 also fail because Plaintiffs' deeds unambiguously excluded the intervening road from the conveyances.*

Even assuming the State of Washington acquired merely an easement interest in the Woodinville Snohomish Road, Plaintiffs have failed to show that they own the entirety of the land underlying the road in fee simple. To the contrary, the deeds associated with Claims 10, 11, and 13–16 conclusively demonstrate that the property these plaintiffs acquired did not embrace the Woodinville Snohomish Road. It follows that these Plaintiffs cannot rely on the centerline presumption to assert an interest in the rail corridor because the property they own is not adjacent to it.

For their part, Plaintiffs correctly observe that—under Washington common law—when the State acquires an easement to construct a highway or road, fee simple ownership of the land under the highway or road remains with the adjacent landowner.[21] *See* ECF No. 25 at 36 (citing *Finch v. Matthews*, 443 P.2d 833, 838 (Wash. 1968)). Because Plaintiffs own the land underlying the rail corridor to its centerline and because the Woodinville Snohomish Road was established after the right-of-way grant to the Railway, the argument goes, they also own the entire width of

[21] That is not to say, however, that state highways and roads in Washington may only be established as easements, as Plaintiffs incorrectly argue. *See* ECF No. 25 at 36 (citing *Finch v. Matthews*, 443 P.2d 833, 838 (Wash. 1968)). Although the quoted language from *Finch* could broadly be read as articulating such a rule, *Finch* specifically concerned an easement. 443 P.2d at 838. And *Burmeister v. Howard*, 1 Wash. Terr. 207 (1867), the case *Finch* relied on, held only that fee remains with the adjacent landowner "*when* an easement is taken as public highway." *Id.* at 211 (emphasis added). Moreover, such a rule would conflict with state statutory law. In the same 1937 statute that provided for the predecessor provision to § 47.04.040, the Washington legislature authorized the State, when "necessary to secure any lands for a right of way for any primary state highway, . . . to acquire such lands in behalf of the state by gift, purchase or condemnation." 1937 Wash. Sess. Laws 147–47 (codified at Wash. Rev. Code § 47.12.010). As explained above, the statute also vested fee simple title in the State for certain state highways and roads previously constructed, improved, and maintained by the State. *Id.* at 151–52 (codified at Wash. Rev. Code. § 47.04.040). For purposes of the Court's analysis, however, it assumes arguendo that the State of Washington acquired only an easement for the intervening roads at issue.

the road in fee simple. *See id.* But Plaintiffs implicitly put themselves in the shoes of an unidentified remote grantor who owned the property at the time the road was established. In other words, they ask the Court to impute to them the same ownership interests held by the person who owned Plaintiffs' property when the State acquired its interest in the Woodinville Snohomish Road. The evidence does not justify that analytical leap. Quite the opposite, the property described in Plaintiffs' deeds clearly extends up to—but does not include—the intervening road, so they must rely on the centerline presumption to claim an interest in it. Even assuming they could, their interest would extend only to the center of the road and no further.

Plaintiffs principally rely on *Haggart*, which in turn relied on the Washington Supreme Court's decision in *Finch v. Matthews*, 443 P.2d 833 (Wash. 1968). In *Finch*, the court held that the City of Seattle (or King County) acquired an easement over land dedicated in a plat map for use as a public street. *Id.* at 838. As such, it explained, the fee in the street "remain[ed] in the owner of the abutting land, and the public acquire[d] only the right of passage, with powers and privileges necessarily implied in the grant of the easement." *Id.* (citing *Burmeister*, 1 Wash. Terr. 207 (1867)). *Haggart* read *Finch* to establish a straightforward rule that landowners adjacent to a highway ipso facto own the land underlying the entire width of the highway in fee simple. But a closer review of *Finch*—and its predecessor, *Burmeister*—does not support that reading. Instead, those cases establish that fee simple ownership remains with the person who owned the land when the highway easement was acquired. *See Burmeister*, 1 Wash. Terr. at 211 ("[W]hen an easement is taken as a public highway, *the soil and freehold remain in the owner of the land encumbered* only with the right of passage in the public . . . ." (emphasis added)). Although the adjacent landowner may have owned the land underlying the highway in fee simple at some point, it does not follow that successive owners of the adjacent property always will. Such a rule would run

headfirst into *Roeder*, which held that mere ownership of adjacent land is not enough to assert an interest in an abutting right of way. 716 P.2d at 862. Rather, to demonstrate ownership of the land underlying the road, Plaintiffs must show that they acquired their property from the fee owner of that land—here, the person who owned the land when the State acquired its purported easement to construct the Woodinville Snohomish Road. *See id.*

*BHL Properties v. United States*, 135 Fed. Cl. 222, 228 (2017), reinforces this conclusion. In that case, as here, the plaintiff's property was "separated from the rail corridor by" an intervening highway. And like Plaintiffs here, the plaintiff in *BHL* argued that he could invoke the centerline presumption because he also "owns the land underlying [the highway], burdened by a highway easement held by the county." *Id.* *BHL* rejected that argument for two reasons: (1) the plaintiff's deed made no mention of the highway, and (2) the deeds belonging to the plaintiff's predecessors-in-interest described the property as "end[ing]" at the highway. *See id.* at 228–29. "[E]ven if [the plaintiff] is the presumed owner of the land underlying [the highway] to its centerline," the court concluded, "he would not own the northern portion of [the highway] on the other side of its centerline, and he thus would still not own property abutting the railroad corridor." *Id.* at 229.

Plaintiffs here must confront—but cannot overcome—the same barrier. Some of their deeds contain legal descriptions marking the Woodinville Snohomish Road as the outer edge of their property, meaning they cannot rely on the centerline presumption to assert an interest in the land underlying the rail corridor. *See Roeder*, 716 P.2d at 861 (holding that the centerline presumption applies where a deed refers to the right of way "as a boundary without clearly indicating that the side of the right of way is the boundary"); *see also Lavington v. Hillier*, 510 P.3d 373, 380 (Wash. Ct. App. 2022) (holding that a deed describing the property as "Northerly

of the Northerly right-of-way line" of a state highway plainly rebutted the presumption that the grantor intended to convey to the centerline of the highway). What is more, most of the deeds include metes and bounds descriptions, rebutting the centerline presumption by demonstrating Plaintiffs' grantors' intent to exclude the land underlying the highway—assuming the grantors owned it to begin with. *See Roeder*, 716 P.2d at 862 ("A metes and bounds description in a deed to property that abuts a right of way is evidence of the grantor's intent to withhold any interest in the abutting right of way . . . ."). The language of the relevant deeds is set forth below.

***Maverick, LLC (Claim 10).*** The deed acquired by Maverick, LLC describes the relevant boundary of the property as the east edge of the Woodinville-Snohomish Highway: "The South 590 feet, as measured along the East line, of the Southeast Quarter of the Southwest Quarter of Section 3, Township 28 North, Range 5 East, Willamette Meridian, in King County, Washington, *lying Easterly of the Easterly Margin of the Woodinville-Snohomish Highway* . . . ." ECF No. 25-5 at 124 (emphasis added). The deed further references a 1995 boundary line adjustment survey, which clearly shows that the western boundary of the property (Parcel C) ends at a point that is east of the Woodinville Snohomish Highway. *Id.* at 128.

***GT Clearwater LLC (Claim 11).*** GT Clearwater LLC's deed granted two distinct parcels and incorporated by reference the same boundary line adjustment survey as Claim 10: "Parcels A and B of City of Woodinville Boundary Line Adjustment No. BLA 95-027, Recorded October 03, 1995, under recording no. 9510039002, in King County, Washington." ECF No. 25-6 at 2. The boundary line adjustment, in turn, contains detailed metes and bounds descriptions of the parcels in question. Parcel A's boundary is described in relevant part as lying "westerly along said southerly line to the *easterly line of Woodinville-Snohomish Road* . . . thence *southerly along said east line to the south line of Lot 7, Block 3 of said plat* . . . ." *Id.* at 7 (emphasis added). The metes

and bounds description associated with Parcel B, by contrast, does not refer to either the Woodinville Snohomish Road or the Railway as a boundary. Instead, the boundary line is described as "west to the easterly line of County Road Number 207; thence southerly along the easterly line of county road to a point west of the" point of beginning. *Id.* The parties do not discuss whether "County Road Number 207" is synonymous with the Woodinville Snohomish Road. Plaintiffs' exhibits, however, suggest the answer is yes because the boundary line adjustment survey depicts the Woodinville Snohomish Road as the only conceivable road to which this property description could refer. *See id.* at 6; *see also id.* at 12 (aerial photograph of relevant parcel lying west of the eastern margin of the Woodinville Snohomish Road).

***Pacific Systems Building Associates, LLC & DeJong Delta/BC LLC (Claim 13).*** The deed associated with Claim 13 conveyed Unit 2 of Bear Creek Plaza Condo. *Id.* at 54, 56. The deed's legal description incorporates a condominium plat dated July 30, 2003, *id.* at 56, which in turn describes in metes and bounds the property's eastern border as running "*along the westerly line of Secondary State Highway 1–A . . . to a point on the westerly margin of said Highway 1-A* . . . ." *Id.* at 60 (emphasis added). The condominium plat map likewise shows the property's boundary lines lying outside the margin of Woodinville Snohomish Road. *Id.* at 61.

***Money Saver Woodinville Associates, LLC (Claim 14).*** The property associated with Claim 14 concerns Unit 1 of Bear Creek Plaza Condo, *id.* at 87, and thus the deed contains the same metes and bounds property description as the deed for Claim 13. *Compare id.* at 83, *with id.* at 60.

***Woodinville Hotel Investors LLC (Claim 15).*** The deed associated with Claim 15 identifies two distinct parcels conveying a specific portion of three lots set forth on the 1890 plat map for the Bear-Creek Addition to Day City. The first, "Parcel 1," incorporates metes and bounds

language that describes the property boundary as extending "*to the westerly margin of Woodinville Snohomish Road*; thence south . . . west *along said westerly margin* 336.76 feet to the true point of beginning." *Id.* at 106 (emphasis added). The second, "Parcel 2," conveys two lots in an associated plat "*except that portion thereof, if any, lying easterly of the west margin of Woodinville-Snohomish Road* (also known as State Road No. 1A)." *Id.* at 107 (emphasis added).

***SLH Woodinville Development LLC (Claim 16).*** Finally, SLH Woodinville Development's deed also conveyed property with a boundary that runs "*to the Westerly Margin of the Woodinville-Snohomish Road*; [t]hence South 05º38'47" West *along said Westerly Margin* to the Southeast corner of Lot 4 . . . ." *Id.* at 132 (emphasis added). The deed further references a 2021 boundary line adjustment survey, *id.*, which clearly shows that the eastern boundary of the property (Parcel B (adjusted)) ends at the west edge of the Woodinville Snohomish Highway. *Id.* at 135.

Like *BHL*, the properties conveyed by these deeds end at the edge of the Woodinville Snohomish Road. *See* 135 Fed. Cl. at 228–29. Accordingly, even if remote grantors owned the land underlying the road to the edge of the railroad right of way, Plaintiffs plainly did not acquire such property through their current deeds. Instead, their land borders the intervening road. And even assuming the centerline presumption were applied to these claims, Plaintiffs' title would extend only to the center of the Woodinville Snohomish Road, not to the rail line. Accordingly, Claims 10, 11, and 13–16 fail for the additional reason that their property does not border a railroad right of way, as *Roeder* requires.

*c. For Claim 17, even assuming the centerline presumption applies, it is rebutted by a metes and bounds description.*

Unlike Claims 10–16, the property at issue in Claim 17 (owned by Underwood Gartland) is directly adjacent to the railroad right of way. *See* ECF No. 25-6 at 174. Even if Plaintiffs had

properly presented the chain-of-title evidence necessary to apply the centerline presumption to this claim, the presumption has been rebutted by the use of a metes and bounds description in the plat map for the Park at Woodinville, which was expressly incorporated into the deed as the legal description of the property conveyed to Underwood Gartland. *See Cook v. Hensler*, 107 P. 178, 180 (Wash. 1910) ("[W]here a deed describes land as a lot laid out on and designated on a certain plat or survey, the plat becomes as much a part of the deed as if it were copied into it."). Thus, Plaintiffs have failed to support their claim of ownership with regard to the property at issue in Claim 17 because the relevant deed reflects the grantor's intent to not convey the land underlying the right of way.[22]

Underwood Gartland's own deed incorporates a plat map that identifies the edge of the rail corridor as a boundary using a metes and bounds description. The legal description in Underwood Gartland's deed identifies the property as "Lot B, Binding Site Plan #9710310291, Volume 182 of Surveys, pp. 90–95, *being a portion of Lot 4, Park at Woodinville*, Volume 128, pp. 94–96, King County, Washington." ECF No. 25-6 at 156 (emphasis added). The Park at Woodinville

[22] Although the Government made specific arguments to rebut the centerline presumption for numerous claims, it did not do so for Claim 17. *See* ECF No. 26 at 17–21 (addressing Claims 1, 8, 10–16); ECF No. 30 at 15–18 (discussing the chains of title evidence for only Claims 10–16), 20 (arguing that the centerline presumption is rebutted "as to claims 1, 8, and 12–16, all of which utilize metes and bounds descriptions"). The Government's lack of a tailored opposition to Claim 17, however, does not automatically entitle Plaintiffs to summary judgment. Instead, "[w]hen, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006). Accordingly, the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). If a movant "fails to proffer" evidence creating a genuine dispute of material fact on an issue for which it bears the burden of proof, "not only must its motion for summary judgment be denied, but summary judgment for [the opposing party] must be granted." *Astor v. United States*, 79 Fed. Cl. 303, 308 (2007) (citing *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004)). For the reasons explained below, undisputed facts show that Claim 17 fails, so the Government is entitled to summary judgment on that claim.

plat map was executed in 1984 and includes an extensive metes and bounds description that clearly excludes the land underlying the right of way. The portion addressing the boundary of the property (and specifically, Lot 4) that runs parallel to the right of way is as follows:

> . . . thence south 89º 54'11" west 102.04 feet to the easterly right of way margin of Burlington Northern Railway; thence north 5º 38'18" east along said right of way 985.81 feet to the north line of said southeast quarter of the northwest quarter . . . .

*Id.* at 169; *see* ECF No. 27-3 at 786 (legible copy of plat map).[23] As was the case in *Roeder*, "[a] boundary falling in the center of the right[] of way is inconsistent with the careful metes and bounds description[] in [this] deed[]." 716 P.2d at 862 (providing the following example of a metes and bounds description sufficient to rebut the centerline presumption: "thence North Three Hundred Fifty-three (353) feet to the South line of the Railroad Right-of-Way of the [railroad]; thence Easterly along said Right-of-Way South line One Hundred Sixty and Thirty-Six Hundredths (160.36) Feet"). Accordingly, Underwood Gartland cannot successfully rely on the centerline presumption because the metes and bounds description in the Park at Woodinville plat map, which defines the property conveyed in its deed, indicates the grantor's intent to not convey the fee interest in the right of way. *See id.* at 861 (noting that the centerline presumption is rebutted where "the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear"); *Hornish*, 899 F.3d at 698 (affirming district court decision rejecting ownership claim based on centerline presumption, in part, because their common grantor expressly reserved the fee interest in the right of way and the plaintiffs' deeds contained metes and bounds descriptions that identified the right of way as a boundary); *see also Beres*, 143 Fed. Cl. at 78 ("As

---

[23] The Court also notes that, although the Park at Woodinville plat map identifies a number of applicable easements (including easements for underground electric systems, waterline easements, and electric distribution easements), the map nowhere identifies the rail line as an easement across the property. ECF No. 25-6 at 167; *see* ECF No. 27-3 at 784 (legible copy of plat map).

with the interpretation of deeds, when interpreting a plat map, under Washington state law, the intent of the parties who made the plat governs the interpretation of the plat." (citing *Gwinn v. Cleaver*, 354 P.2d 913, 915 (1960))).

Plaintiffs appear to discount this specific evidence, instead relying on the guarantees produced by Fidelity Title, the company Plaintiffs used to acquire their chains of title. *See* ECF No. 27 at 6–7. According to Plaintiffs, "even if the Court views the [G]overnment's rebuttal evidence as casting some doubt on the presumption's applicability, Plaintiffs' full chains of title prove beyond a shadow of a doubt that no grantor . . . intended to reserve or except fee title to the railroad right-of-way from their conveyances." *Id.* at 19. But the guarantees of a third-party title company cannot overcome the specific language included in Underwood Gartland's own deed. As Plaintiffs recognize, the centerline presumption is a "rule of construction" that dictates how much property a particular deed conveys. ECF No. 25 at 32. If the presumption applies, Plaintiffs own to the center of the rail corridor; if it does not apply, they do not. Because the presumption does not apply here where Underwood Gartland's deed excludes the rail corridor, it does not own land underlying the rail corridor and thus lacks a "compensable property interest" in the land affected by the NITU. *Zanzarella*, 183 Fed. Cl. at 361.

* * *

Thus, even assuming Plaintiffs had properly invoked the centerline presumption, the Court would grant summary judgment for the Government as to the condemnation plaintiffs (Claims 10, 11, and 13–17) on the alternative grounds addressed above.

### D. Plaintiffs Concede That the Government Is Entitled to Summary Judgment as to the Claims of Tjossem and Lazy Deuce.

The Government is entitled to summary judgment on two claims that Plaintiffs conceded at oral argument. In their opening brief, Plaintiffs did not move for summary judgment in favor

of Tjossem (Claim 18) or Lazy Deuce (Claim 19), instead noting that their claims involve "further title and liability issues beyond those addressed in this Motion." ECF No. 25 at 6 n.1. The Government, however, moved for summary judgment on these two claims. ECF No. 26 at 6. At oral argument, Plaintiffs' counsel agreed that summary judgment should be entered against Tjossem and Lazy Deuce, conceding that Tjossem was already fully compensated in another case and that Lazy Deuce lacks fee simple title over the property at issue. *See* ECF No. 37 at 109:7–111:8. Accordingly, the Court grants summary judgment for the Government on Claims 18 and 19.

## IV. CONCLUSION

For these reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 25) and **GRANTS** the Government's Cross-Motion for Summary Judgment (ECF No. 26). The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: November 16, 2026

*<u>/s/ Kathryn C. Davis</u>*
KATHRYN C. DAVIS
Judge